# UNITED STATES DISTRICT COURT

_____ NORTHERN _____  DISTRICT OF  _ILLINOIS, EASTERN DIVISION_

UNITED STATES OF AMERICA

        v.

BENY GARNEATA, DUMITRU CURESCU, LAVINIA CURESCU, TEOFIL SCORTE, WILLIAM WELLHAUSEN, VASILE FOFIU and MARIO OLIVELLA,

MAGISTRATE JUDGE ASHMAN

CRIMINAL COMPLAINT

CASE NUMBER:

# 0 8 CR 398

       I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.  From on or about June 2007 through December 2007, in Chicago, in the Northern District of  Illinois, Eastern Division, and elsewhere, defendants BENY GARNEATA, DUMITRU CURESCU, LAVINIA CURESCU, TEOFIL SCORTE, WILLIAM WELLHAUSEN, VASILE FOFIU and MARIO OLIVELLA, did conspire with each other and others to bribe City of Chicago officials in violation of Title 18, United States Code, Section 666;

       In violation of Title 18, United States Code, Section 371.

I further state that I am a Special Agent, United States Postal Inspection Service, and that this complaint is based on the following facts:

       See Attached Affidavit

**FILED**

MAY 2 0 2008  TC

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

Continued on the attached sheet and made a part hereof:  _X_  Yes  _____  No

Signature of Complainant

Sworn to before me and subscribed in my presence,

May 20, 2008
Date

Hon. Martin Ashman, U.S. Magistrate Judge
Name & Title of Judicial Officer

at  Chicago, Illinois
City and State

Signature of Judicial Officer

## AFFIDAVIT

I, DAVID B. HODAPP, being duly sworn under oath, depose and state as follows:

## I.  BACKGROUND OF AFFIANT

1.  I am a Postal Inspector with the United States Postal Inspection Service and have been so employed since September 1987.  In connection with my official duties, I have investigated violations of federal criminal law, including violations relating to public officials.  I have received training and participated in all normal methods of investigation, including, but not limited to, visual and electronic surveillance, the general questioning of witnesses, the use if informants, and undercover operations.  I have also received training in the enforcement of laws concerning, among other things, public corruption and white-collar crime.

## II.  PURPOSE OF AFFIDAVIT

2.  This affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint charging from no later than in or about June 2007 until at least December 2007, DUMITRU CURESCU, LAVINIA CURESCU, VASILE FOFIU, BENY GARNEATA, MARIO OLIVELLA, TEOFIL SCORTE and WILLIAM WELLHAUSEN did conspire with each other and others to bribe City of Chicago officials with respect to the property located at 1637-39 West Granville, in violation of Title 18, United States Code, Section 666, all in violation of Title 18, United States Code, Section 371.

3.  This investigation has been jointly conducted by the United States Postal Inspection Service ("USPIS"), the City of Chicago Office of Inspector General ("IG") and the Federal Bureau of Investigation ("FBI").  The information contained in this Affidavit is based on my personal knowledge as well as information obtained from other law enforcement agents participating in the investigation, cooperating witnesses,

documents, and recorded conversations. Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that DUMITRU CURESCU, LAVINIA CURESCU, VASILE FOFIU, BENY GARNEATA, MARIO OLIVELLA, TEOFIL SCORTE and WILLIAM WELLHAUSEN conspired to commit violations of 18 U.S.C. § 666.

### *Commencement of Investigation*

4.  This phase of the criminal investigation began in April 2007 when investigators obtained information concerning a shakedown scheme involving individuals including a particular "expediter," or businessperson who takes permit applications and other construction issues to the City on behalf of homeowners and developers. Specifically, evidence indicated that a certain building inspector was posting stop work orders on properties and agreeing to lift the order only if the property's owner used this particular expediter. In May 2007, law enforcement agents interviewed the expediter (hereinafter referred to as CW1), and the expediter agreed to cooperate with the government in its investigation.[1] In the fall of 2007, federal agents obtained authority from Chief Judge James F. Holderman to intercept conversations over the cellular telephone ("Target Phone 1") and office telephone ("Target Phone 3") used by BENY GARNEATA. The interception began on October 4, 2007, and ended on December 28, 2007. Summaries of

---

[1] CW1 has not been charged with any crime. CW1 understands that he/she will be charged with a violation of federal criminal law. On April 3, 2008, the government entered into a letter agreement with CW1 regarding the government's proposed sentencing recommendation. CW1 has no previous arrests or convictions. Investigators believe CW1 to be reliable. Although CW1 lied to agents during the initial interviews about the nature and scope of the expediter's relationship with City employees, CW1 has subsequently spoken with investigators numerous times under proffer protection, and is believed to have provided truthful information. CW1 has provided information about bribes activities by over thirty individuals. This information has been corroborated for a number of those individuals by recorded conversations and/or controlled bribe payments.

certain intercepted conversations are set forth throughout this affidavit, and they reveal the corrupt nature of the relationship of DUMITRU CURESCU, FOFIU, GARNEATA, OLIVELLA and others.

***Overview of the Granville property conspiracy***

5.  This investigation has revealed that DUMITRU CURESCU and LAVINIA CURESCU purchased a 13-unit building located at 1637-39 West Granville and 6139-41 North Paulina ("the Granville property") in approximately June 2007.  DUMITRU CURESCU and LAVINIA CURESCU, with the assistance of VASILE FOFIU, BENY GARNEATA, MARIO OLIVELLA, TEOFIL SCORTE, WILLIAM WELLHAUSEN, and others, performed construction work on the building which did not conform to the Chicago Building Code and Zoning Ordinance by 1) adding two illegal dwelling units to the building and 2) performing deficient plumbing work.  The investigation has revealed that bribes were paid to City of Chicago inspectors to allow this non-conforming work to be executed.

6.  The following is a brief summary of each individual:

a.  DUMITRU CURESCU is a contractor and developer.  According to CW1, in approximately late 2005 or early 2006, DUMITRU CURESCU paid bribes to City employees, including an $8,000 bribe to a Zoning employee through CW1, to add two additional illegal dwelling units to a project at 5700 North Maplewood.

b.  LAVINIA CURESCU is the co-owner of the Granville property with her husband, DUMITRU CURESCU.

c.  VASILE FOFIU is related to DUMITRU CURESCU and employed by BENY GARNEATA.  His sons are currently working as realtors with Wrightwood Realty Company in an attempt to sell the Granville units.

d.  BENY GARNEATA is a contractor and developer.  GARNEATA is the

3

owner/operator of M5 Electrical Contractors and M3 Plumbing. CW1 first met GARNEATA in 1998 and has performed expediting services over the past ten years for GARNEATA and associates of GARNEATA.

e. MARIO OLIVELLA is employed as a Plumbing Inspector for the Department of Buildings. OLIVELLA has been an employee of the City of Chicago since June 15, 1998. According to CW1, OLIVELLA is a long-time friend of BENY GARNEATA. CW1 recalls paying bribes to OLIVELLA on two occasions. In 2005, CW1 paid a $9,000 bribe to OLIVELLA from a developer so that the developer would not have to install a booster pump on a project which was required by the Chicago Building Code. In approximately March 2007, CW1 paid a bribe of $2,000 to $2,500 to OLIVELLA from another developer so that OLIVELLA would overlook some plumbing violations.

f. TEOFIL SCORTE is the owner of Algin Construction and Development (Algin). Algin provides architectural, construction and expediting services to contractors and developers. In approximately October 2006, according to CW1, CW1 paid a $6,000 bribe to WILLIAM WELLHAUSEN to obtain two additional illegal dwelling units for a project of SCORTE's on Altgeld. In addition, SCORTE told investigators when interviewed in March 2007 that in approximately November 2006, SCORTE requested assistance from Adrian Oros in expediting three sets of architectural drawings. Each of the three projects that SCORTE requested Oros to expedite involved multi-unit buildings in which the developer was seeking the proposed addition of dwelling units. Oros paid a $12,000 bribe to City building inspector David Johnson in exchange for Johnson obtaining zoning approval of the additional illegal dwelling units for SCORTE's three projects. Both Oros and Johnson were convicted on federal bribery charges.

g. WILLIAM WELLHAUSEN is a zoning investigator in the Department of Zoning. WELLHAUSEN has been employed with the City of Chicago since June 16,

1994. CW1 recalled paying bribes to WELLHAUSEN on several occasions for favorable inspection reports related to the issuance of Certificates of Occupancy and inspection reports that purportedly showed illegal dwelling units as pre-existing.  As mentioned above, according to CW1, CW1 paid a $6,000 bribe to WELLHAUSEN related to a project on Altgeld for SCORTE in approximately October 2006.  In approximately January 2007, CW1 paid a $12,000 bribe to WELLHAUSEN from another developer so that the developer could obtain three additional illegal dwelling units for a project at 4034 West School Street.  Finally, while cooperating with the government, CW1 paid WELLHAUSEN two controlled, recorded bribes in exchange for favorable zoning inspection reports unrelated to the Granville conspiracy,

## III. EXPLANATION OF THE BUILDING PERMIT PROCESS AND CITY DEPARTMENTS

7.  The process for issuing building permits and monitoring construction projects is governed by several departments within the City of Chicago, including the Department of Zoning ("Zoning"), the Department of Construction and Permits ("DCAP"), the Department of Buildings ("Buildings") and the Department of Administrative Hearings ("AH").

8.  The principal role of Zoning is to enforce Chicago's Zoning Ordinance, to implement the city's land use policies and to maintain and update the city's official zoning maps. Developers seeking to obtain a building permit for new construction and renovation projects which require architecture plans receive an initial review of their architectural plans in Zoning to assure that the project conforms to the official zoning and land use policies of the City of Chicago.  Zoning reviews the survey plats, parking lot layouts and site plans to ensure that projects conform to the Zoning Ordinance.  When a proposed development is not in compliance with the Zoning Ordinance or permitted use, a developer has the option of seeking an administrative adjustment or a zoning variance.

The administrative adjustment process is a streamlined procedure for minor modifications of selected zoning standards. The zoning variance procedures involve review and approval of the requested changes by the Zoning Board of Appeals. Zoning is also responsible for administering the landscape ordinance within the zoning code which governs landscaping of all business, commercial and large residential projects. In addition, zoning is responsible for issuing Certificates of Occupancy (a certificate from the City certifying that a structure is fit for human habitation) for construction projects containing between one to three dwelling units and for issuing Zoning Compliance Certificates (a certificate from the City certifying that a structure meets the applicable zoning requirements) for the occupancy, use, or change of use of any property in the city. Projects receive an initial review in Zoning by a zoning plan examiner ("ZPE"). On-site investigation of projects to ensure compliance with the Zoning Ordinance, including the landscape ordinance, and Certificate of Occupancy reviews are performed by zoning inspectors.

9. DCAP is responsible for issuing construction permits. Prior to the creation of DCAP in April 2003, construction permits were issued by Buildings. A permit application must include the names and City license numbers of the general contractor and each subcontractor who intends to work on the construction project. To obtain a general contractor's license from the City, an applicant must mail a license application to an address maintained by the Department of Buildings. License applications must be renewed by mail every year. Generally, the construction permit application process follows one of three different tracks: the Easy Permit Process ("EPP"), Standard Review Plan process, or Developer Services process. EPP is used to obtain construction permits for repair or replacement of existing elements of a building, when no structural changes to the building will be made. Standard Review Plan (also referred to as Open Plan

Review) is used to obtain construction permits for small to mid-sized construction and renovation projects requiring architectural drawings. The Standard Review Plan process involves an initial assessment of a construction project by a DCAP project manager. After the project manager review, the architectural plans receive technical reviews of appropriate disciplines which include, among others, electrical, plumbing, ventilation, structural, architectural, landscape and fire prevention. The purpose of each discipline review is to ensure that the proposed project is in conformance with the building codes and regulations of the City of Chicago. The Developer Services process is used to obtain construction permits for large and complex projects. In January 2008, DCAP merged back into the Buildings Department.

10. Buildings is responsible for the enforcement of the Chicago Building Code governing the construction, rehabilitation and maintenance of structures within the City of Chicago. Within Buildings is the New Construction Bureau. New construction inspectors' primary role is to perform inspections to ensure that construction and renovation work conforms to the permits that have been issued by DCAP. Building inspectors can also respond to complaints regarding structures, including emergencies that occur after working hours, and they can issue violation notices to building owners when a structure is not in conformance with the Building Code. Inspections can also be generated by the public by dialing 311, the non-emergency number for city services. Inspectors can also issue "stop work orders" to stop any construction that is done without a permit, contrary to an approved permit, and other forms of construction that poses a threat to the health and safety of the public. A stop work order is a directive from the Department of Buildings, addressed to the owner of property on which construction or demolition work is proceeding without proper authorization. The stop work order prohibits further work, and in some cases requests the removal of work already

7

completed, until or unless an appropriate construction permit has been obtained. There are different procedures for releasing each kind of stop work order, which can include paying fines and/or paying additional permit fees. Some releases can occur at the City's satellite offices (additional offices located in various neighborhoods for the convenience of property owners and developers), while others involve the applicant presenting the plans and application to the DCAP or to another Department, usually at City Hall. Inspectors sign the back of a contractor's construction permit when an inspection is performed and the inspector determines that the completed work is within the requirements of the Building Code and the scope of the construction permit. Certificates of Occupancy for construction and renovation projects involving four or more units are also issued by Buildings. Building Inspectors conduct inspections of projects prior to the issuance of Certificates of Occupancy. Finally, Buildings has historically maintained a mainframe computer database that contains information about buildings in the City of Chicago, including the number of original units in each building.

11. AH serves as a quasi-judicial tribunal for the expedient, independent and impartial adjudication of municipal ordinance violations. AH has several divisions, including a Building Division. The purpose of the Building Division is to adjudicate cases initiated by the Buildings, Fire and Zoning departments.

12. Contractors, developers, and homeowners may hire a permit expediter to facilitate the construction permit application process. The services performed by a permit expediter include, among other things: completing construction permit application forms; collecting and submitting relevant documents to DCAP and Zoning; waiting in line at City Hall for plan reviews; scheduling building inspections; meeting with architects, contractors, developers, homeowners, City of Chicago inspectors and other City of Chicago officials; resolving building code violations; and obtaining Certificates of

8

Occupancy. City of Chicago employees are prohibited from acting as permit expediters.

13. Obtaining timely reviews, approvals, and permits is important to developers. Waiting for a lengthy period of time for a review, failing to pass an inspection to obtain a permit, or the issuance of a stop work order can have significant financial consequences for developers. These circumstances can preclude developers from starting or completing the work that needs to be done on a project (thereby lengthening the period of time for a project which may add costs or at least delay the time at which a developer can recoup capital tied up in a project), or require developers to do additional work on a project (thereby increasing the cost of the project). For example, as described in detail below, WELLHAUSEN accepted a bribe payment in exchange for providing a favorable zoning inspection report related to zoning approval of two illegal dwelling units for a property located at 1637-39 West Granville and 6139-41 North Paulina. The approval of two additional illegal dwelling units is significant from a financial standpoint for the developer because the developer will earn approximately $400,000 in gross revenues from the sale of these units. Moreover, the developer will have avoided the costly and time-consuming process of obtaining a zoning variance required to legitimately add the two units to the development. Based on my knowledge and experience on this investigation, I believe that the zoning variance process takes approximately six months to a year to complete with no guarantee that the additional units will be approved.

## IV. HISTORICAL INFORMATION FROM CW1

14. CW1, an expediter, began actively cooperating with the government in May 2007. CW1's cooperation has included conducting consensually recorded calls and meetings, and playing the role of "bagman" (collecting bribe money from developers and contractors seeking some official act from a City employee or a "priority" handling of a

project and paying the bribes to City of Chicago employees).[2]

15. CW1 has advised law enforcement that it was the practice of developers and contractors with whom CW1 has worked to express a willingness to bribe a City official for actions typically by expressing a desire to "do whatever it takes" to get an action accomplished. CW1 may inquire from the developer or contractor if CW1 has a "budget" to work with or if this action is a "priority." CW1 would then communicate to the City official that an "incentive" is available. In other instances, City officials would solicit bribe payments from CW1 initially, and CW1 would then communicate this to the developer or contractor. The developer or contractor would then pay CW1 for expediting services and the payment would include the amount of any bribes that CW1 paid to City officials.

16. According to CW1, developers and contractors will pay bribes to employees in Zoning for: a) overlooking violations of the zoning ordinance; b) increasing the reported number of existing dwelling units in a building being rehabbed to avoid a costly and time-consuming zoning variance process; c) providing a favorable or expedited inspection for a Certificate of Occupancy; and d) expediting a Zoning Compliance Certificate faster than the normal process. CW1 has admitted to paying bribes to zoning inspectors for these actions.

---

[2] On June 1, 2007, CW1 entered into a consent agreement with the USPIS to allow the government to "autorecord" all communications transmitted or received on CW1's cellular telephone in which CW1 participated (including voicemail messages left for CW1). This agreement allowed CW1 to make and receive calls during the course of this investigation outside of the presence of a Postal Inspector and to conduct CW1's business as an expediter. Under the agreement, CW1 was not allowed to let anyone other than CW1 use the cellular telephone and CW1 was also limited to using the cellular telephone for conducting business as an expediter. All calls were recorded. CW1 had no control over the autorecord and could not manipulate whether a call was recorded or not. Pursuant to court orders signed approximately every thirty or sixty days, beginning on June 4, 2007 and continuing to March 28, 2008, (with the exception of a period of time in January 2008 during which the autorecord was not renewed) signed by either the Chief Judge or Acting Chief Judge, all calls sent or received from CW1's cellular telephone for a period of thirty or sixty days were recorded using the same technology employed in a Title III wiretap but without the requirement of contemporaneous monitoring by law enforcement agents.

17. CW1 has told investigators that developers and contractors will pay bribes to DCAP employees for: a) speeding up the Standard Plan Review process; and b) obtaining quicker review appointments. CW1 has admitted to paying bribes to certain clerical employees and technical reviewers in DCAP for these actions.

18. CW1 has told investigators that developers and contractors will pay bribes to Buildings employees for: a) overlooking construction work which does not conform to City building codes; b) overlooking work performed beyond the scope of a building permit; c) removing building code violations; d) lifting stop work orders; e) signing-off on building permits without performing an inspection; f) providing favorable or expedited inspections for a Certificate of Occupancy; and g) changing information in the Building Department's mainframe computer system. CW1 has admitted to paying bribes to inspectors in Buildings for these actions.

19. CW1 has told investigators that developers and contractors will pay bribes to AH employees for: a) expediting the AH process and b) negotiating a settlement. CW1 has admitted to paying bribes to Buildings employees assigned to AH to facilitate adjudication of Buildings cases in AH in a manner favorable to CW1's clients.

## V. PROBABLE CAUSE[3]

### *Illegal dwelling units at the Granville property*

20. On June 20, 2007 at approximately 9:50 am, CW1 received a telephone call from DUMITRU CURESCU. The call was consensually recorded, and I have reviewed the

---

3 Throughout this Affidavit, I describe various conversations that were consensually recorded. These descriptions often include my understanding of what is being said during such conversations. This understanding and interpretation of the conversations is based on (I) the contents and context of the conversations, (ii) my experience as a law enforcement officer and the experience of other law enforcement officers in this investigation, including our experience listening to the conversations as a whole, and (iii) the investigation to date, including information obtained from CW1 and others. All times listed are approximate. The summaries of the recorded conversations set forth in this Affidavit are based on draft transcriptions. Finally, the summaries below do not include all potentially criminal consensually recorded conversations, or all statements or topics covered during the course of the conversations.

recording of this conversation.    During the conversation, DUMITRU CURESCU informed CW1 about the purchase of the Granville property and made an initial request for CW1's assistance in obtaining approval for the illegal basement dwelling units.

D. CURESCU:    I need some help.  I got an apartment that I want to see if I could turn it into - - it's a basement, nine-foot ceiling.  I don't have to dig down at all.  It's building that I just purchased and I could give you the address and if you want to meet with me some time to see if we could make the papers you know for to have an apartment [in the basement] out of it.

CW1:    Okay.  How many units is it currently?

D. CURESCU:    Currently I got 13.

CW1:    Thirteen units?  Is that how you bought it, 13 units?

D. CURESCU:    I bought it 13 units, yes.  I got one basement on other side of the building, which is you know cleared.  It was a storage room with a bathroom and I want to make an apartment out of it.

CW1:    Okay so you want to basically go the route of getting it approved as a legal basement [unit]?

D. CURESCU:    Yes.

CW1:    I'll do a little research and then I'll contact you.  All right and then you're willing to pay whatever it takes to do that, right?

D. CURESCU:    Yeah, whatever the cost, definitely.

According to CW1, CURESCU was asking for CW1's assistance in obtaining approval to

add illegal dwelling units in the basement of the Granville property. When CW1 said

CW1 would "do a little research," CW1 was informing CURESCU that CW1 would

contact a city inspector about obtaining approval for the illegal dwelling units in

exchange for a bribe. In addition, when CW1 asked CURESCU if he was "willing to pay

whatever it takes," CW1 was confirming that CURESCU was willing to pay a bribe to

get approval for the illegal dwelling units.

21. On June 20, 2007 at approximately 2:46 pm, LAVINIA CURESCU left a

voicemail message for CW1. The call was consensually recorded and I have reviewed

the recording. LAVINIA CURESCU identified herself as DUMITRU's wife and said

that she wanted to give CW1 the address for the property. She said it was a corner

building at 1637 West Granville and 6139 North Paulina.

22. On June 20, 2007 at approximately 4:41 pm, CW1 left a voicemail message for

LAVINIA CURESCU. The call was consensually recorded and I have reviewed the

recording. CW1 advised LAVINIA CURESCU that CW1 received her message

regarding the Granville property, but that he/she couldn't recall how many units

DUMITRU purchased the building for. CW1 asked LAVINIA CURESCU to call her

back and leave a message and CW1 would "do my research."

23. On June 20, 2007 at approximately 4:46 pm, LAVINIA CURESCU left a

voicemail message for CW1. The call was consensually recorded and I have reviewed

the recording. LAVINIA CURESCU said, in substance, that the building had 13 existing

legal units and they wanted to add an additional unit that was "not legal."

24. On June 20, 2007 at approximately 8:04 pm, CW1 left a voicemail message

for DUMITRU CURESCU. The call was consensually recorded and I have reviewed the

recording. CW1 said CW1 had gotten the address from LAVINIA CURESCU. CW1

said: "It's the Granville address and I did an inquiry and it looks good."

25. On June 28, 2007, at approximately 10:35 am, CW1 placed a consensually

recorded call to DUMITRU CURESCU.   I have reviewed the recording of this conversation.   During the conversation, CW1 and CURESCU discussed how many dwelling units were legal and how many additional illegal dwelling units CURESCU wanted to obtain:

CW1:        So you have legal 13?

D. CURESCU:   I'm pretty sure that I have legal 13.  That's what I have the paper from, from the seller that I got 13, and he have sent me some paper from the city too that I got 13 apartments. What do you have in your - - in what you have inquired, what does it show?

CW1:        I don't have the file with me.  I have to double check.  But I know I discussed it [with a city inspector] and it looks really good at getting that basement unit.  So you bought it as a 13 unit building?  You have proof for the 13 units?

D. CURESCU:   Yes, I do want to double check to make 100 percent of the 13 unit its legal.

CW1:        Okay so there's a possibility you want to legalize two basement units.

D. CURESCU:   Yes, it's a possibility.  But I think the 13th unit is legal.

CW1:        Okay.  You know that for sure?  Because I don't want to go there and negotiate and then they turn around and you gave me the wrong information.  So I need to know is it 12 or 13 because I need to let - -

D. CURESCU:   Right now it's 13.  Yeah, 13 and I want to legalize the 14th one.

CW1:        Okay I'll check in my file to make sure of that.  If not we

14

might legalize two basement units. You need to put that on a priority rush [with the architect] because this availability isn't going to last. We need to move forward ASAP. So whatever it takes.

According to CW1, when CW1 was trying to verify the number of illegal dwelling units CURESCU wanted, CW1 was informing CURESCU that the amount of the bribe would depend on the number of illegal dwelling units that CURESCU wanted to add to the Granville property. Moreover, when CW1 used the term "negotiate," CW1 was talking about reaching an agreement with the city inspector on the amount of the bribe payment. Finally, when CW1 stated that "this availability isn't going to last," CW1 meant that the ability to pay a bribe to a city inspector to obtain approval for the illegal dwelling units needed to be performed immediately due to inspectors being nervous about recent bribery arrests. In addition, I had previously impressed upon CW1 the government's desire to complete the bribe transaction quickly.

26. On June 28, 2007 at approximately 10:40 am, CW1 called DUMITRU CURESCU. The call was consensually recorded and I have reviewed that recording. During the conversation, CW1 discussed the amount of the bribe payment with CURESCU. In the following excerpt of the conversation, CW1 discussed the amount of the bribe payment the last time CW1 assisted CURESCU in obtaining approval for illegal dwelling units:

> CW1:  I'm not sure what the fee's going to be on this, but can you give me an idea of what maximum you want to pay for each unit?
>
> D. CURESCU:  Well I think what we have done in the past will work with me.
>
> CW1:  Okay, so I will let you know then. It's possible it might

15

|              | end up being $5,000 per unit. |
|--------------|-------------------------------|
| D. CURESCU:  | I believe I gave you $4,000 per unit last time. |
| CW1:         | Okay well we'll work on something with these guys [city inspectors]. We'll see how it works out. |
| D. CURESCU:  | Okay. |
| CW1:         | I'm just letting you know in case - - |
| D. CURESCU:  | That's fine, that's fine whatever you know, just not to exceed $5,000. |
| CW1:         | Not to exceed $5,000. |
| D. CURESCU:  | Not to exceed $5,000 per unit. |
| CW1:         | Okay. All right, DUMITRU. I have a question on that other project we had done in the past. What was the address on that project again? |
| D. CURESCU:  | 5700 Maplewood. |
| CW1:         | 5700 Maplewood. Okay, thanks DUMITRU. |

According to CW1, DUMITRU CURESCU advised CW1 that the bribe amount he previously paid through CW1 to the city inspector for approval of illegal dwelling units at 5700 Maplewood was $4,000 per unit and the bribe amount he was willing to pay to a city inspector for approval of illegal dwelling units at the Granville project was no more than $5,000 per unit.

27. On July 6, 2007 at approximately 10:09 am, CW1 called DUMITRU CURESCU. The call was consensually recorded and I have reviewed the recording. During the conversation, CW1 and CURESCU discussed preparation of the drawings for the Granville project.

|              | |
|--------------|---|
| D. CURESCU:  | I just got the plans roughly done and today I'm meeting with TEO. I think you met him. And we're going to |

decide exactly how the drawings are going to be, how the apartments are going to be divided and so forth.

CW1:          Give me an idea of when that's going to be ready.  So [I've] got you on my agenda and I can't wait very long on an issue like this.

D. CURESCU:   I'm going to call you back today.

CW1:          Okay or have TEO call me.

28. On July 6, 2007 at approximately 1:32 pm, TEOFIL SCORTE called CW1.  The call was consensually recorded and I have reviewed the recording.   During the conversation, SCORTE requested a meeting with CW1 to discuss the drawings ("layouts") for the Granville project with him and DUMITRU CURESCU.

29. On July 9, 2007 at approximately 8:55 am, CW1 called SCORTE.  The call was consensually recorded and I have reviewed the recording.   During the conversation, SCORTE asked CW1 about how the illegal dwelling units should be reflected in the existing drawings that needed to be submitted to the City.

SCORTE:       I wanted to ask you for the basement, should we show existing as just open or should we show existing as units down there?

CW1:          Well he wants to get 13 units out of that building, right?

SCORTE:       You have to talk to him about that.  I think it's more.

CW1:          It's more?  How many units is he looking for?  Because when he spoke to me he told me 13 units.  So why don't you, you know decide what he wants to do and let me know.

SCORTE:       Well I mean I'm going to leave that between you two guys. So I'm going to have him just give you a call.  All right?

17

| | |
|---|---|
| CW1: | Okay because the drawings have to reflect the number of units that he's requesting. |
| SCORTE: | As existing. |
| CW1: | Yes. |
| SCORTE: | All right let me have - - I think, yeah I think it's better if you guys touch base and clarify that.  I thought you guys talk[ed] about it, because I mean better you guys talk directly. |
| CW1: | Okay, just let him know and then tomorrow I'd like to meet with you guys around 1:30, 2:00 o'clock. |
| SCORTE: | Come by my office and we can sit down.  I'll show you what we have so far and if any changes need to be made, my architects can make the changes. |

30. On July 10, 2007 at approximately 10:14 am, SCORTE called CW1.  The call was consensually recorded and I have reviewed the recording.  During the conversation, CW1 discussed the architect drawings with Scorte:

| | |
|---|---|
| CW1: | DUMITRU is going to be there, also, and the architect. |
| SCORTE: | Well, we are the architect. |
| CW1: | Okay, the licensed architect's going to be available, right? |
| SCORTE: | Well, yeah, he's on my payroll.  He's in my office 24-7. |
| SCORTE: | Do you need just the full set of [architectural] plans with mechanicals, or do you need just the architectural plans for zoning preliminary? |
| CW1: | I would need everything for the most part.  I mean if you've got a preliminary set we could try to work with it and have zoning take a look at it, but they won't sign off on |

18

anything unless they're ready to go with the drawings.

| | |
|---|---|
| SCORTE: | We'll try to wrap them up in a week for DUMITRU. |
| CW1: | Okay and you had mentioned something about DUMITRU wanted more units besides 13. |
| SCORTE: | Yes. |
| CW1: | Is that [the new illegal unit] going to reflect the drawings [as existing dwelling units]? |
| SCORTE: | Yes. |
| CW1: | Okay, and how many total units is he looking for? |
| SCORTE: | Well let's just talk about it in at the office. |
| CW1: | Okay. |

31. On July 10, 2007 at approximately 2:28 pm, CW1 met with SCORTE and DUMITRU CURESCU at SCORTE's office at 4747 West Peterson in Chicago, IL.   The meeting was consensually recorded by CW1 and I have reviewed the recording of this meeting. The purpose of the meeting was to discuss the process of obtaining approval for illegal units for the Granville project. The following is an excerpt of that conversation:

| | |
|---|---|
| SCORTE: | This is the new layout for the basement plan. |
| CW1: | Okay. |
| SCORTE: | We have one, two, three dwelling units with storage over here.  All right? |
| CW1: | Okay.  So you want to add three dwelling units. |
| SCORTE: | Yes.  These two because this one should have already been. |
| D. CURESCU: | No, two.  It's an existing one. |
| CW1: | So how many total? |
| D. CURESCU: | 13 units existing. |
| SCORTE: | And 15 proposed. |

19

CW1:            Okay, because here it's saying that there's a contingency
                upon the 13 unit to be legal.  So I think the City has it as
                12, but I'll have to double check.

SCORTE:         Well no, what happened with that is when I first talked to
                LAVINIA we wanted to make sure that 13 was legit.  So
                we pulled records for them.

CW1:            OK.

SCORTE:         Wait, let me pull the file.  I'll show you.

CW1:            Yeah, let me have a copy of that, too.

SCORTE:         Which you [inaudible] ... your records.

[SCORTE leaves room.]

CW1:            So you want to add two additional units.

D. CURESCU:     Yeah.  This one here and that one there.

CW1:            Okay.  So it's a legal 13.

D. CURESCU:     Uh-huh.

CW1:            And you have a permit to show that.  Is that what TEO has,
                the previous permit?

D. CURESCU:     Yes.

D. CURESCU:     Yes, that's what he's -- yes.

CW1:             Okay.

D. CURESCU:     There's some bathrooms even in this.

CW1:             And one storage, right?

D. CURESCU:     In one of them, I believe and the second one too.  I'm not
                100 percent, but in one of them there is a bathroom.

CW1:            Okay.  That's that 13th one?

D. CURESCU:      No, the 14th.

                              20

| | |
|---|---|
| CW1: | The 14th. |
| D. CURESCU: | That one there, there's two bathrooms I believe. |
| CW1: | Okay, so there's bathrooms.  But you bought it as a legal 13. |
| D. CURESCU: | Yes, yes. |
| CW1: | Okay. |
| D. CURESCU: | Hello?  Yes.  Who?  Yes.  Oh yes, can I call you back.  I'm in a meeting right now.  **[SCORTE RE-ENTERS THE ROOM]** Okay I will call you right back.  Thanks. |
| T. SCORTE: | I think I already gave it to Lavi actually. |
| D. CURESCU: | Yeah. |
| SCORTE: | We also took the liberty of ordering handwritten permits just in case they do ask for it. |
| CW1: | Okay.  Good. |
| SCORTE: | That was the dwelling unit verification and it says 13 units. |
| CW1: | Okay so you want 15 versus 13 legal.  A total of 15, right? ... So you're looking in hopes that there's a permit for 13 legal units. |
| T. SCORTE: | Well we have, what we have from them is we have -- |
| D. CURESCU: | Just a second.  I'm going to go and bring this thing, because she's (inaudible). |

**[CURESCU LEAVES ROOM]**

| | |
|---|---|
| SCORTE: | What we have is not a prior permit, but it's a dwelling unit verification sheet from the Water Department from I don't know how far back.  So it says 13 units on that.  We just took the liberty of doing that just in case you are going to |

need it.

CW1:            Okay.

SCORTE:         We don't want -- yeah, sometimes if you don't know what
                you're doing it could screw things up more.

CW1:            Right.

SCORTE:         So that's why I didn't want to touch it.

CW1:            Okay.  So the plans are pretty much in order. You're
                showing the basement units as existing -- the two
                additional units.

SCORTE:         You tell me.

CW1:            Well you're looking to get 15.

SCORTE:         So show them as existing.

CW1:            Yeah, you have to show them as existing.

SCORTE:         Okay, okay.

CW1:            Is that how you would normally do it?

SCORTE:         I mean I don't want to touch this stuff anymore, from what
                happened before.  So normally yes, you know but I'm --
                that last go around.[4]

CW1:            Yeah, what ever happened with that?

SCORTE:         We got the plans back.

CW1:            You got -- where were the plans?

SCORTE:         From [a high-level zoning official, hereafter referred to as

---

[4] Based on my knowledge of this investigation, I believe that SCORTE is referring to three
sets of architectural plans that he gave to Adrian Oros in approximately November 2006.
As previously stated, Oros paid a bribe of $12,000 to former Building Inspector David
Johnson in exchange for Johnson obtaining zoning approval for additional illegal dwelling
units on the three sets of architectural plans that Oros received from SCORTE.  In March
2007, SCORTE was interviewed and told agents that he was not aware of the bribe that Oros
paid to Johnson.  Oros and Johnson were both convicted on federal bribery charges.

|          | Individual A]. |
|----------|----------------|
| CW1:     | Oh, Individual A had them. And how did they get into Individual A's hands? Through Individual B? Wasn't Individual B involved, or - - ? |
| SCORTE:  | No, no, no. [DCAP Project Manager] Individual C said are you sure we stamped these, because the stamp was worn out. And that's how. He went over to zoning and zoning says no we never stamped these. That's how it all started. |
| CW1:     | So who stamped them, then? Were they just copies of a stamp? |
| SCORTE:  | I don't know. |
| CW1:     | But that got resolved. |
| SCORTE:  | Well it got resolved in a sense that the plans came back. Do you know what happened to Kurt [Berger, former Buildings project manager]?[5] |
| CW1:     | Yeah, I heard about Kurt. It didn't have anything to do with that project. |
| SCORTE:  | No, no, no. |
| CW1:     | Okay. |
| SCORTE:  | Thank God, but you never know who's listening. |
| CW1:     | Right. |
| SCORTE:  | That's why I want to talk. Like I said for me I got too much riding on what I'm doing here to--if you have your hands in too many pots it starts to get – with me it's like we |

---

[5]In March 2007, City Buildings Department supervisor Kurt Berger was charged with bribery. He subsequently pled guilty.

focus more on doing the architectural plans.

### [CURESCU RE-ENTERS ROOM]

CW1:            How long have you been doing this now, TEO, a while?

SCORTE:         A year ago I started the architectural division; prior

                to that I was doing construction and real estate

                development.  So I generally have about two of my own

                projects that we do at a time.

CW1:            So you have two architects.

SCORTE:         No, I have four.  Four architects.  Yeah, two are licensed.

CW1:            So who's the architect on this project?

SCORTE:         [Individual D].

CW1:            And what's Individual D's number just in case I need to

                ever call him for something?

SCORTE:         He's here.  Oh, just call me.

CW1:            Now here I've got a question for you, DUMITRU.  Last

                time you gave me that Maplewood project you said that the

                units were already changed in the system by someone.

                Remember you said that you had paid someone to change

                those units.  Can you go that route again?

D. CURESCU:     No.

SCORTE:         I'll be right back.

CW1:            Okay, so then you need me to do everything.

### [SCORTE LEAVES THE ROOM]

D. CURESCU:     Well he actually he pulled out a print, he

                pulled out a print, that's all.

CW1:            Okay.  So how did you manage to have the number of units

24

correct then when we took it in for the zoning?  Did he

change the units?  I mean, may I ask who did that?

D. CURESCU:     I just got the print from him.

CW1:            Okay.  You don't wish - - you don't want to discuss that,

okay.  All right because there's two steps to this as you're

aware.   I'm going to have to deal with the Building

Department on this and I'm going to have to deal with

DCAP.

D. CURESCU:     You pretty much know what you're doing.

CW1:            To get those two units, right.

D. CURESCU:     You know what you did before and I - - you know.

CW1:            Okay.  So you're basically ready to do whatever you need

to then, to get those two units.

D. CURESCU:     Yes, yeah, yeah.

CW1:            Okay all right.  So then I have to check and find out what

the price is now because the last time we did the

Maplewood - -

D. CURESCU:     I'd rather not -- I don't know, you know what's going on,

you know at present, you know.

CW1:            Okay.

D. CURESCU:     You know if --

CW1:            We basically touched on this over the phone and we had

said that with Maplewood you did four a piece.

D. CURESCU:     Uh-hmm.

CW1:            Okay.

D. CURESCU:     Yeah.

CW1:            So is that your limit?

D. CURESCU:     Yes.

CW1:            I mean if they come back and they give

                me a bigger price.

D. CURESCU:     Then I'll work with you know, whatever it needs to, but

                you know not to exceed.

CW1:            What's your max so I know where to cut off

                when I'm dealing with these guys?

D. CURESCU:     Well see what they say and then I'll let you know.  I

                imagine that they won't go sky high you know.

CW1:            Yeah, but this is you know not easy to do.

D. CURESCU:     I'm not saying it is easy you know, but you know I'm

                prepared.

CW1:            Okay, and then TEO's going to do the expediting.  You just

                want me to basically take it into zoning.

D. CURESCU:     Yeah and well I need the stamps like you did before.

CW1:            Okay.  No, I mean first zoning needs to look at it.

D. CURESCU:     Uh-huh.

**[SCORTE RE-ENTERS THE ROOM]**

CW1:            And zoning needs to sign off on it.  So who's going to do

                that?  Who's going to do the expediting?

D. CURESCU:     TEO (inaudible).

CW1:            You're going to take it into zoning once --?

SCORTE:         Well in this particular project I would rather not to be very

                honest.

CW1:            Okay.

26

SCORTE:    It's like we'll do the intake appointment, pick up the plans -
- all that stuff.

CW1:    Right.

SCORTE:    But the initial zoning meeting I don't know about it. I don't
want to know about it. So I think -- you know what I
mean? I don't think it's good for you to do half and you
know.

CW1:    Right. Well I'll take it into zoning if you want me to take it
into zoning.

D. CURESCU:    You took care of zoning [for the Maplewood project],
right?

CW1:    I took care of zoning, but then you guys took care of -- I
mean the plan was already expedited when I got it.

D. CURESCU:    Who expedited my plan, [Individual E], or who?

SCORTE:    That's not, that's not the problem. The problem I guess is I
don't -- for me what's difficult is I don't want to know how
it's going to get done, you know.

D. CURESCU:    Okay, but --

CW1:    Because what I'm trying to explain to DUMITRU last time
we had the Maplewood project it was already done in the
system.

SCORTE:    Yeah.

CW1:    I just had to take it into zoning and get the inspection.

SCORTE:    And that's fine. And if you do that then we can take it from
there, but I'm not taking it to zoning period.

CW1:    Okay.

27

SCORTE:          I'm not touching it.

D. CURESCU:      Okay.

SCORTE:          So it's just pretty much the same process.  If you get --

                 zoning signs off, we'll do the rest.

CW1:             Zoning is my end then.

SCORTE:          Yeah.

D. CURESCU:      And the rest of it is yours?

SCORTE:          Uh-hmm.

CW1:             Then you're - - yeah, right you're going to take it into the

                 intake appointment and do all of that.

SCORTE:          Yeah.

CW1:             All right.   So then I will check with whoever I need to

                 check with.

D. CURESCU:      Sure.

CW1:             Can I have that preliminary drawing?

SCORTE:          Yeah.

CW1:             Is it more or less --

SCORTE:          It's exactly how it's going to be.

CW1:              -- the basement, just the basement units, right?

SCORTE:          Well it's, I'm going to have everything for you, the top floor

                 and the bottom floor.

CW1:             Okay.

SCORTE:          So you don't think -- so we'll keep it like this then.

CW1:             Yeah, I mean that's --

SCORTE:          As existing.

CW1:              -- that's what he wants.  He wants two --

                                      28

D. CURESCU:     Yeah.

SCORTE:          Well then thank you. I didn't know -- what I didn't know if we wanted to show it as existing or if we wanted to show it as additional to, so

CW1:             No, they're not. I mean they have got to work with existing just like they did before.

SCORTE:          Okay.

D. CURESCU:     Yeah.

SCORTE:          Okay that's what we're going to do then.

D. CURESCU:     Okay.

CW1:             Okay. I need to have the drawings and then once the drawings are all printed then you give them to me and then I go from there.

SCORTE:          Yeah, we'll print them out tomorrow.

CW1:             Okay, all right.

SCORTE:          So, okay. That's pretty much to my mind.

CW1:             All right, so the reason why I'm asking you about the money, and I don't like to talk about it over the phone.

D. CURESCU:     I know.

CW1:             So we've got to come -- I mean we're here in the office. We got to come to some terms on this.

SCORTE:          Yeah, yeah you guys -- let me get out of here.

CW1:             So what is your max?

## [SCORTE LEAVES THE ROOM]

D. CURESCU:     CW1, I don't know what -- I believe the most entitled here to say the number it's you because you deal --

29

|              | you have a knowledge of these things. I don't. I build only once. |
|--------------|-------------------------------------------------------------------|
| CW1:         | Okay, right. |
| D. CURESCU:  | So I paid four you know, but now I don't know what's in there. |
| CW1:         | Okay, because I want to know – |
| D. CURESCU:  | You know because I believe you know so why aren't you being frank with me? |
| CW1:         | See I want to know, DUMITRU because I don't want to waste their time. And if they give me a price that's higher than what you paid last time, then I want to say forget about it. I'll call you and say forget about it because I don't like going back and forth with this. |
| D. CURESCU:  | No, I don't, I don't -- I don't -- first of all I didn't call you to waste your time. |
| CW1:         | Okay. |
| D. CURESCU:  | Okay. I'm a grown up. I don't fool around. If I need to fool around I go to the beach you know, I mean at the beach. |
| CW1:         | Right. |
| D. CURESCU:  | But so you know I'll go to what's necessary, but you know I don't need to be strangled you know. |
| CW1:         | Right. |
| D. CURESCU:  | It's not like I'm -- |
| CW1:         | Okay. So last time we did four. |
| D. CURESCU:  | Yeah. |

CW1:            So should I just say no higher than six or --?

D. CURESCU:     No higher than five.

CW1:            No higher than five, okay.  Okay.  But that

                transaction will include the Department of Buildings also,

                if they have to change the number of units.  Because I have

                to go to two departments.  I don't know what you paid that

                person for Maplewood to get the printout, because I know

                you had mentioned they charged you quite a bit of money

                and you were really upset about it.

D. CURESCU:     Well I was upset because some other people, which I knew

                you know those people they --

CW1:            They were in the Buildings Department.

D. CURESCU:     They, they -- no, the -- some guys that got that

                piece of paper like I did, they didn't need all these other

                things.  They got away with just that piece of paper.

CW1:            Okay, showing the units.

D. CURESCU:     Yeah, showing the units.

CW1:            Okay, all right.

D. CURESCU:     But me, I had to come up with a big chunk of-- you know.

CW1:            Okay, but that person was not with the City.  They went to

                someone at the City and did whatever they had to.  Okay.

D. CURESCU:     They went into somewhere, but I don't know where and

                they got me that paper.

CW1:            Okay.  All right.  Okay so we'll see whatever we need to do

                on our end.

D. CURESCU:     Yeah, yeah.

CW1:        Okay, all right.  Okay, DUMITRU I just wanted to make

            sure we're on the same page with all of this.

D. CURESCU: We are on the same page.

CW1:        Okay.

D. CURESCU: You'll be happy with me, you know.  There's no gimmicks

            here or funky place you know.

CW1:        Right.

D. CURESCU: You do the job.  I'm here to take care of you.  You know

            you just have to be reasonable with me.  I'm not Mr. Trump.

CW1:        Okay.  I've got it down here what you -- what we discuss so

            I'll keep that in mind.

D. CURESCU: Okay.

CW1:        Okay, and then with the other transaction with the Building

            Department you want that included in this, or is that going

            to be a different figure you want to work with?

D. CURESCU: You tell me how do you want to work it.

CW1:        Okay.  I'll have to ask -- yeah, I'll have to ask around.

D. CURESCU: You don't ask around.  You talk to me right now.

CW1:        No, because now it's different DUMITRU.  You know

            there's been a lot of different people there.

D. CURESCU: Then talk to me.  Okay then talk to me.  Then talk to me.

CW1:        I would say with that transaction maybe three.

D. CURESCU: How about five and five and two?

CW1:        Five and five and two, okay.  I'll keep that in mind.  And

            then my expedite --

D. CURESCU: If it has to be three, it's going to be three.  But then let's

make this what are there and I'm fine with that.

CW1:            Okay and I will let you know what my expediting fee's

                going to be.

D. CURESCU:     Well he's [SCORTE] going to do the expediting.

CW1:            No, I mean to take it to zoning.

D. CURESCU:     You're going to (inaudible).

CW1:            If not, I'll try to, I'll try to work it.

D. CURESCU:     Please work with this.

CW1:            Yeah, I will.

D. CURESCU:     See because that's how far I could go.

CW1:            Okay. All right.

D. CURESCU:     Please.

CW1:            So --

D. CURESCU:     I could introduce -- I got a guy that he's -- he wants

                to do. He just called me and he did a building right across

                the street from Maplewood and I could introduce him to

                you, and he's a guy that wants to do the same thing.

CW1:            Okay. All right well let's do this first and then we'll talk

                about him next.

D. CURESCU:     Okay, yeah, that's fine.

CW1:            It becomes too pressurizing you know.

D. CURESCU:     Yeah, no, no, I want you to be relaxed in everything. I trust

                you.

CW1:            Okay.  So, DUMITRU, then TEO will bring me the

                drawings and that's sometime this week.

D. CURESCU:     Yeah, yeah.

CW1:              And then we go from there.

D. CURESCU:       He was just waiting for you to kind of look at the drawings

                  to see if it's okay with you with what you.

CW1:              Okay.  And then I'll call you with how much it is and then

                  you bring me a down payment and then we'll go from there.

D. CURESCU:       Okay, yes, no problem.  Thank you.  I appreciate it.  I

                  appreciate it very much.

CW1:              Okay you too, bye-bye.

**[CW1 LEAVES SCORTE'S PERSONAL OFFICE and sees SCORTE**

**outside]**


CW1:              Okay, TEO.

SCORTE:           You guys are all squared away?

CW1:              Have your guy call me when the drawings are ready.

SCORTE:           Yeah, Thursday morning I believe.

CW1:              Okay sounds good.

32. According to CW1, the purpose of the meeting between CW1, DUMITRU

CURESCU and  TEOFIL SCORTE was to: 1) determine how the illegal dwelling units

should be reflected on the architectural drawings; 2) define CW1's and SCORTE's role

with respect to the completing the permit process, including approval of the two

additional illegal dwelling units; and 3) determine the amount of the bribe that

CURESCU was willing to pay to obtain approval of the illegal dwelling units.   CW1

agreed to obtain zoning approval for the Granville property, including paying the

required bribes to the Department of Buildings official for a change in the mainframe

computer printout and the Department of Zoning official to perform a sham inspection

indicating that the two additional illegal dwelling units were pre-existing. SCORTE

34

agreed to prepare the architectural drawings which included showing the two illegal dwelling units as pre-existing and to expedite the plans through DCAP after CW1 obtained Zoning approval. CURESCU agreed to pay bribes of up to $12,000 ("five and five and two") to obtain approval for the two additional illegal dwelling units. In addition, CURESCU and SCORTE discussed previous projects in which bribes were paid. CURESCU described how he paid a bribe of "four a piece" ($4,000) to obtain two illegal dwelling units for a project on Maplewood. SCORTE described a project which involved an illegal zoning stamp and how he recovered the architectural drawings back from the City.

33. On July 17, 2007, [SCORTE's brother-in-law, hereafter referred to as Individual F] delivered the Granville architectural plans to [CW-1's employee, hereafter referred to as Individual G]. The plans falsely reflected three existing units in the basement.

34. On July 20, 2007 at approximately 1:39 pm, LAVINIA CURESCU left a voicemail message for CW1. The call was consensually recorded and I have reviewed the recording. LAVINIA CURESCU said she was calling to get an update from CW1. LAVINIA CURESCU asked CW1 to give DUMITRU or her a call.

35. On July 24, 2007 at approximately 9:39 am, DUMITRU CURESCU called CW1. The call was consensually recorded and I have reviewed the recording.

| | |
|---|---|
| D. CURESCU: | At this point we're waiting on the two extra units that we want to legalize, correct? |
| CW1: | Right. |
| D. CURESCU: | Okay. How soon can that be done? |
| CW1: | Well I believe I'm okay with the change in the [city's mainframe] computer, and I will have that printout in hand hopefully today or tomorrow the latest. |
| D. CURESCU: | Okay. |

35

| | |
|---|---|
| CW1: | So then from there we take it to zoning.  And then zoning will - - like what happened the last time [with Maplewood], remember? |
| D. CURESCU: | Zoning will send out some people and - - yeah, I have to show them the building and then we wait for them to send you something. |
| CW1: | Right, and then from there we meet and you know do the transaction, or whatever we need to do on your end, okay? |
| D. CURESCU: | Yeah, okay, then. |

36. On July 25, 2007 at approximately 10:41 am, CW1 called DUMITRU CURESCU.  The call was consensually recorded and I have reviewed the recording. During the call, CW1 discussed the amount of the bribe payment for the mainframe computer printout:

| | |
|---|---|
| CW1: | I have your [mainframe computer] printout for Granville. |
| D. CURESCU: | Okay. |
| CW1: | So we've got the number of units in place and I'm going to take it in to zoning. |
| D. CURESCU: | Okay, sounds good. |
| CW1: | I need to meet you regarding the printout. |
| D. CURESCU: | Okay, I need to meet with you, if you could come at the office, or I think that would be the best thing. |
| CW1: | Okay.  Is your schedule pretty much open? |
| D. CURESCU: | Yeah, just call me. |
| CW1: | Okay. And it's going to be $2,500. |
| D. CURESCU: | Whatever. |

37. On July 25, 2007 at approximately 10:45 am, DUMITRU CURESCU called

CW1.  The call was consensually recorded and I have reviewed the recording.  During the call, DUMITRU CURESCU discussed arrangements for making the bribe payment to CW1.

| | |
|---|---|
| D. CURESCU: | Please see, Individual H with this thing [the mainframe computer printout] and he'll take care of you.  I just spoke to him. |
| CW1: | Who is Individual H? |
| D. CURESCU: | The hardwood floor guy. |
| CW1: | Oh, Individual H, yeah. |
| D. CURESCU: | Yeah, he's my helper and he'll stop - - as soon as you call me that you got this thing [the mainframe computer printout] I'm going to call him to stop by and see you. |
| CW1: | Okay.  Because I thought it might be convenient for me to just jump off the highway there to see you at your office. |
| D. CURESCU: | Okay.  Then I'm going to talk with LAVINIA [CURESCU] and I'm going to leave these things with LAVINIA at the office. |
| CW1: | Okay. |
| D. CURESCU: | Then you just stop by. |

38. On July 25, 2007 at approximately 4:11 pm, CW1 called DUMITRU CURESCU.  The call was consensually recorded and I have reviewed the recording.  CW1 and DUMITRU CURESCU discussed a meeting location to pass the bribe money.

39. On July 25, 2007 at approximately 5:02 pm, DUMITRU CURESCU called CW1.  The call was consensually recorded and I have reviewed the recording.

| | |
|---|---|
| CW1: | I'm getting on the highway now.  So I should be there shortly, depending on the traffic.  I'll meet you at Touhy |

|  | and Cicero. |
| --- | --- |
| D. CURESCU: | Touhy and Cicero, my wife [LAVINIA CURESCU] will be there because she's got the thing. All right? |
| CW1: | All right. No problem. |

40. On July 25, 2007 at approximately 5:28 pm, CW1 called DUMITRU CURESCU. The call was consensually recorded and I have reviewed the recording. CURESCU told CW1 that LAVINIA was driving a black SUV, and that she was probably already at the gas station.

41. On July 25, 2007 at approximately 5:39 pm, LAVINIA CURESCU called CW1. the call was consensually recorded and I have reviewed the recording. They agreed to meet at a Shell station, and CW1 said that he/she would be there in "five or ten minutes."

42. On July 25, 2007 at approximately 5:49 pm, CW1 met with LAVINIA CURESCU at the Shell Gas station located at Touhy and Cicero. CW1 met with agents at the briefing location prior to meeting with LAVINIA CURESCU. An audio recording device was placed on CW1. Agents gave a City of Chicago mainframe computer printout to CW1 which reflected 15 existing dwelling units for the Granville property[6] CW1 drove CW1's vehicle to the meeting location at Touhy and Cicero and agents followed CW1 to the meeting location. The meeting between CW1 and LAVINIA CURESCU was videotaped with audio by surveillance agents.

| CW1: | Hi, I wanted to give you the [mainframe computer] printout. |
| --- | --- |
| L. CURESCU: | Okay. |
| CW1: | And it's showing what you guys had asked for, 15 units. |
| L. CURESCU: | Okay. |

---

[6] For this and each controlled bribe meeting described in this affidavit, Agents searched CW1's personal effects but not CW1's person or vehicle.

CW1:            It's been in zoning today so we're waiting for the water records, and then the inspector will be in touch with me and we'll notify you the date of the inspection.

L. CURESCU:     Okay. Any idea time, like time frame?

CW1:            Well it's been in zoning already. Now what's going to hold it up is [Individual F, SCORTE's brother in law who worked for SCORTE] ordered records for previous permits. Get on Individual F's case about it, getting them from records and then get them to me. If there are no previous permits that's fine. As long as I get the response from the records he had ordered.

L. CURESCU:     He said that he already went in and that they told him he just needs to wait.

CW1:            Yeah, I guess they're a month behind, but it was ordered on the 26th so it's almost a month. So he needs to go. I saw him downtown today while I was in zoning. So tell him to make sure that his people follow up in records on that.

L. CURESCU:     Okay.

CW1:            Okay, so as soon as I get that I take it back to zoning. Zoning will order the inspection then.

L. CURESCU:     Okay.

CW1:            This is for just the Buildings Department, the transaction for changing the units [in the mainframe computer system].

L. CURESCU:     Yeah.

CW1:            Right. There's -- how much is in here?

L. CURESCU:     25 [$2,500].

CW1:                    Okay, all right, okay.

Surveillance agents observed LAVINIA CURESCU exit her vehicle carrying a large brown envelope, approach CW1's vehicle and hand the envelope through the driver's side window to CW1. CW1 then handed CURESCU the mainframe computer printout. CURESCU returned to her vehicle carrying the computer printout. At the conclusion of the meeting, agents followed CW1 to the debriefing location. CW1 turned over the envelope CW1 received from LAVINIA CURESCU. Agents determined that the envelope contained $2,500 cash.

43. On July 31, 2007 at approximately 1:13 pm, CW1 called LAVINIA CURESCU. The call was consensually recorded and I have reviewed the recording. During the call, CW1 asked LAVINIA CURESCU about the records for the previous permits for the Granville property. LAVINIA CURESCU informed CW1 that she was advised that it could be another three weeks before the records were ready. LAVINIA CURESCU asked CW1 if there was anything that CW1 could do to get the records quicker. CW1 said that CW1 would see what CW1 could do to get the records quicker.

44. On August 2, 2007 at approximately 8:42 am, LAVINIA CURESCU left a voicemail message for CW1. The call was consensually recorded and I have reviewed the recording. LAVINIA CURESCU informed CW1 that she had received the previous permit records for the Granville project and wanted to make arrangements to get those records to CW1.

45. On August 14, 2007 at approximately 11:20 am, CW1 called LAVINIA CURESCU. The call was consensually recorded and I have reviewed the recording. During the call, CW1 informed LAVINIA CURESCU about the status of the zoning inspection.

CW1:                    I'm returning DUMITRU's call regarding the status of the

                        [zoning] inspection for Granville.

40

| | |
|---|---|
| L. CURESCU: | Yes. |
| CW1: | Okay. Can you let him [DUMITRU] know that the guy that I deal with, he was on vacation and he just returned. They're working on getting you guys on the schedule for the inspection. |
| L. CURESCU: | Okay. |
| CW1: | If I get a call [regarding the inspection] I'll keep you posted. |

46. On August 23, 2007 at approximately 3:22 pm, CW1 called LAVINIA CURESCU. The call was consensually recorded and I have reviewed the recording. CW1 told LAVINIA that he/she was trying to reach DUMITRU CURESCU to tell him that the zoning inspection was likely going to take place next week. LAVINIA said that she would have DUMITRU call CW1.

47. On August 23, 2007 at approximately 3:32 pm, DUMITRU CURESCU called CW1. The call was consensually recorded and I have reviewed the recording.

| | |
|---|---|
| CW1: | I'm okay. I didn't forget about you. I've had several meetings about your Granville project. |
| D. CURESCU: | Uh-huh. |
| CW1: | And finally after all these meetings, this has been really hard for me, I was able to get you into the system so that the inspector can come out and look at that property on Granville. The worst part is over with as far as getting the inspector out there. |
| D. CURESCU: | Uh-huh, uh-huh. |
| CW1: | It, it was, it was difficult, but I was in zoning yesterday so they should be out next week. |

41

D. CURESCU:      Oh okay, great.  Great.

CW1:             Okay so in case someone calls you, you need to call me
                 right away.  I left my number also as a contact person.

D. CURESCU:      Uh-huh that's great news, [CW1].  That's great, great news.

CW1:             Okay.  Okay.  So another thing I wanted to find out from
                 you is we're pretty much set on the financial end, right?
                 You're ready to go with that as what we had discussed?

D. CURESCU:      Yes.

48. On August 27, 2007 at approximately 10:05 am, WILLIAM WELLHAUSEN left
a voicemail message for CW1.  The call was consensually recorded and I have reviewed
the recording.  WELLHAUSEN asked CW1 to call him about the Granville property.

49. On August 27, 2007 at approximately 10:32 am, CW1 called WILLIAM
WELLHAUSEN.  The call was consensually recorded and I have reviewed the recording.
During the call, CW1 discussed with WELLHAUSEN the inspection of the Granville
property.

CW1:             I got your message and that Granville property --

WELLHAUSEN:      Uh-hmm.

CW1:             Well there's a little bit of a discrepancy I guess in the
                 number of dwellings in this.  And he bought it as a 15 unit
                 building and he's looking to keep the 15 units.

WELLHAUSEN:      Okay and [a zoning supervisor, hereafter referred to as
                 Individual I] doesn't agree with that, I take it?  That's why
                 Individual I is sending me out there?

CW1:             Oh, okay.  All right.  Well can you go take a look at it
                 because there's been a few discrepancies?   The water
                 record shows one thing.  They did a porch permit which

42

> doesn't verify dwelling units I guess from what Individual I
> is saying.  But on the application that said 16 dwelling
> units, but they don't pay attention to that because it was a
> porch permit.

WELLHAUSEN: Gotcha.

CW1:              So yeah, so this guy is looking to keep those 15 units.  So if
                  you could let me know.

WELLHAUSEN: Yeah.

CW1:              Okay.  And this guy's willing to give the necessary support
                  on this to get whatever else is available.

WELLHAUSEN: Okay great.  Perfect.  So give me a holler of what day is
                  good for him and I'll be out there.

50. On August 27, 2007 at approximately 10:35 am, CW1 left a voicemail message
for DUMITRU CURESCU.  The call was consensually recorded and I have reviewed the
recording.  During the call, CW1 advised DUMITRU CURESCU that CW1 received a
call from the zoning inspector and he is going to be out tomorrow between 11:00 and
12:00.  CW1 said that he [the zoning inspector] needs to get into the basement units of
the property.  CW1 requested CURESCU to call CW1 back to confirm that he received
the message.

51. On August 27, 2007 at approximately 10:38 am, DUMITRU CURESCU called
CW1.  The call was consensually recorded and I have reviewed the recording.  During
the call, CW1 advised DUMITRU CURESCU about the inspection of the Granville
property.

CW1:              We're confirmed tomorrow between 11:00 and 12:00 on
                  Granville.  The inspector [WELLHAUSEN] has called to
                  confirm it.

43

D. CURESCU:        Okay.

CW1:               So I'm going to call him [WELLHAUSEN] now to confirm
                   it. He'll be out there between 11:00 and 12:00.

D. CURESCU:        Yes, 11:00 and 12:00.

CW1:               Right.   Okay and then we go from there and then you'll
                   prepare everything financially and then we'll do whatever
                   we need to do.

D. CURESCU:        Got you.

52. On August 27, 2007 at approximately 10:54 am, CW1 left a voicemail message
for WELLHAUSEN.   The call was consensually recorded and I have reviewed the
recording.   CW1 called WELLHAUSEN to confirm the appointment tomorrow on
Granville between 11:00 and 12:00. CW1 left WELLHAUSEN with DUMITRU's name
and phone number and asked WELLHAUSEN to call CW1 after the inspection.

53. On August 28, 2007, agents conducted a surveillance of the Granville property.
Surveillance agents videotaped WELLHAUSEN's appearance at the Granville property.
WELLHAUSEN arrived at the Granville property at approximately 10:40 am.   At
approximately 11:13 am, WELLHAUSEN exited his vehicle and was talking on his cell
phone.   WELLHAUSEN walked around the building and returned to his vehicle.   At
approximately 11:20 am, WELLHAUSEN drove away from the Granville property.

54. On August 28, 2007 at approximately 12:15 pm, CW1 called DUMITRU
CURESCU.   The call was consensually recorded and I have reviewed the recording.
CURESCU told CW1 that he was going to meet WELLHAUSEN the next day, instead of
that day. CW1 said, "You know, this is like not good with the inspector having to wait
you know and Bill was there." CURESCU replied, "I got you."

55. On August 29, 2007 at approximately 11:09 am, CW1 called DUMITRU
CURESCU.   The call was consensually recorded and I have reviewed the recording.

44

CURESCU informed CW1 that he got a call from Bill [WELLHAUSEN] and he's going to meet CURESCU at the Granville property at 12:30.

56. On August 29, 2007, agents conducted a surveillance of the Granville property. Surveillance agents videotaped WELLHAUSEN meeting with DUMITRU CURESCU to perform an inspection of the Granville property. DUMITRU CURESCU arrived at the Granville property at approximately 12:25 pm and WELLHAUSEN arrived at approximately 12:32 pm. WELLHAUSEN was observed taking pictures on the outside of the building. In addition, WELLHAUSEN and CURESCU were seen entering and exiting the building and walking around the building perimeter.

57. On August 29, 2007 at approximately 1:50 pm, CW1 received a call from DUMITRU CURESCU. The call was consensually recorded and I have reviewed the recording.

> D. CURESCU:   I met with Bill [WELLHAUSEN] and he did his job there [at the Granville property].
>
> CW1:          Okay. So I will just follow up then [with WELLHAUSEN] and get back to you. So just prepare what we had talked about.
>
> D. CURESCU:   Yes.
>
> CW1:          And we'll go from there, okay?
>
> D. CURESCU:   Yes, thank you.

58. On August 30, 2007 at approximately 9:19 am, CW1 called WILLIAM WELLHAUSEN. The call was consensually recorded and I have reviewed the recording. WELLHAUSEN informed CW1 about the results of the inspection and CW1 discussed the bribe payment with WELLHAUSEN.

> WELLHAUSEN: I'm just looking over the pictures of your place [the Granville property]. We [DUMITRU CURESCU and I]

45

|  |  |
|---|---|
| | met yesterday. |
| CW1: | And how did that look? |
| WELLHAUSEN: | Well he only has - - we're adding two. I mean it's a bare basement. He's only got one [dwelling unit] down there, I mean, so I'm giving him two extra ones [dwelling units] that he's going to build. He has nothing. I mean I'm completely fabricating two other ones. |
| CW1: | Okay. |
| WELLHAUSEN: | But we'll be able to do that. I'll work out fine. |
| CW1: | It'll work out fine. |
| WELLHAUSEN: | Yeah. |
| CW1: | You'll be able to give him the two units? |
| WELLHAUSEN: | Yeah, yeah, I was very creative on the photography and the way it works out. Then I'm going to put it [the inspection report] in today. So by this afternoon you could probably hook up with Individual I and get that going. |
| CW1: | Okay. All right. Check with your schedule today to see how it looks. I want to probably meet you. |
| WELLHAUSEN: | Today might be a bad day. So if we can hook up tomorrow that would be wonderful. |
| CW1: | Okay. I was thinking maybe around noon tomorrow? I'll give you a [call] at 11:00 tomorrow. |
| WELLHAUSEN: | Perfect. |
| CW1: | And as far as the price goes I know these are you know really - - |
| WELLHAUSEN: | I always don't worry about you. Whatever you give is fine, |

46

I'll take from you.

CW1:              Okay so I'll call you tomorrow.

WELLHAUSEN: Thank you very much.  I'll talk to you.

59. On August 30, 2007 at approximately 9:24 am, CW1 called DUMITRU

CURESCU.  The call was consensually recorded and I have reviewed the recording.

CW1 discussed the approval of the two illegal dwelling units with CURESCU.

CW1:              I wanted to let you know that Granville has been approved

                  for the two units.

D. CURESCU:   Okay.

CW1:              So I need to meet you today and I was wondering if I could

                  meet you around noon to collect on what we had discussed,

                  which is going to be five a piece.

D. CURESCU:   Yeah, that's not a problem.  But I believe that when I

                  talked to you before you gave me all the papers and the

                  permit if I'm not mistaken.  Right now I'm just having your

                  work [sic].  I don't have anything in hand.

CW1:              What papers?  What are you talking about?

D. CURESCU:   Those papers that are telling me that I have an approval for

                  [15] units.  Right now I don't have anything.

CW1:              Okay, so you want me to give you the paperwork first ?

D. CURESCU:   Yeah, I guess that will be the right way so I feel a little bit

                  (inaudible), you know.

CW1:              Okay.  Well I can ask him [WELLHAUSEN], but that

                  might be an insult to him.  So I mean - -

D. CURESCU:   Well I, I - - it's now an insult of you know this kind of

                  things that you know cost me.  You know, I think I don't

47

want to be insulted in a way that I don't have papers and I find myself that I, I don't have the papers.

CW1:            Okay no problem. I'll go ahead then and - - we'll see what we can get you. Okay?

D. CURESCU:     Thanks. Sure and then call me and I'll see.

60. On August 30, 2007 at approximately 11:13 am, DUMITRU CURESCU called CW1. The call was consensually recorded and I have reviewed the recording. During the call, DUMITRU CURESCU asked CW1 about expediting the Granville project.

D. CURESCU:     Is there a possibility that you could take care of all the other permits for the electrical, plumbing, whatever, all of those stamps that need to be done [for the Granville property]? The expediting, that's what it's called? Can you do that too and give me a number?

CW1:            Okay. All right. Let me put it together and taken I'll get back to you and we'll get it all taken care of.

D. CURESCU:     Yeah, that would sort things out a lot faster.

61. On August 31, 2007 at approximately 10:54 am, CW1 called WILLIAM WELLHAUSEN. The call was consensually recorded and I have reviewed the recording. During the call, CW1 arranged to meet with WELLHAUSEN at a gas station on the Edens Expressway to make the bribe payment for the Granville property inspection performed by WELLHAUSEN.

62. On August 31, 2007, CW1 met with agents at the briefing location. Agents gave $8,000 cash in USPIS funds to CW1 to pay a bribe to WELLHAUSEN for the Granville project. The money was photocopied and placed in an envelope in the presence of agents. An audio recording device was placed on CW1 and a video recording device was placed inside of CW1's vehicle. After the briefing, CW1 drove CW1's vehicle to the

48

meeting location with WELLHAUSEN followed by agents. At approximately 11:35 am, CW1 arrived at the BP gas station located at Touhy and Cicero for a meeting with WELLHAUSEN. The meeting was videotaped from inside CW1's vehicle and outside by surveillance agents. The surveillance videos show WELLHAUSEN walk up to CW1's vehicle.

CW1:            Okay well, I, I got this and - -

WELLHAUSEN: Thank you very much, perfect.

CW1:            - - he [DUMITRU CURESCU] gave me, he gave me four [$4,000] on each for you.

WELLHAUSEN: Oh, I appreciate that very much.

Agents observed and the surveillance videos confirmed that CW1 handed an envelope to WELLHAUSEN out the driver's side window. WELLHAUSEN walked away from CW1's vehicle carrying the envelope and returned to his vehicle. At the conclusion of the meeting, CW1 was followed by agents to the debriefing location. CW1 reported to agents that CW1 delivered the envelope containing the cash to WELLHAUSEN.

63. On September 5, 2007 at approximately 10:07 am, CW1 called TEOFIL SCORTE. The call was consensually recorded and I have reviewed the recording. During the call, CW1 informed SCORTE that the Granville property had landscape corrections that needed to be addressed.

SCORTE:        You need us to do the landscape corrections?

CW1:            Yes. Everything is good in zoning. As soon as the landscape corrections are addressed - - we're going to get it [the architectural drawings for the Granville property] stamped off on.

SCORTE:        Okay so it hasn't gone to landscaping yet?

CW1:            No, there are corrections and Individual F needs to address

49

the corrections.

64. On September 5, 2007 at approximately 11:46 am, CW1 called TEOFIL
SCORTE The call was consensually recorded and I have reviewed the recording. CW1
discussed the status of the Granville project with SCORTE.

CW1:        I wanted to basically talk to you a little bit about that
            project for Granville. Now you know I got the [mainframe
            computer] printout all done. That was all okay and it
            showed the 15 units. And I ran into a problem with zoning
            in the very early part of all of this, but zoning is finally
            giving me the approval for the 15 units. It had the
            inspection. That all went well. They had the inspection
            report so that's a go. There were some landscape
            corrections, which I spoke to Individual F [SCORTE's
            brother-in-law, who worked for SCORTE] about and he's
            going to go downtown today and [CW1's Employee
            Individual G], my guy, has the drawing. And I've asked
            Individual F to see if there's any way he could possibly
            address some of those corrections. They want them to
            eliminate the balconies because it's over the lot line and
            zoning will not approve it without a variance. So they have
            to X out those balconies on the drawing and Individual F is
            going to address those issues.

SCORTE:     Okay. All right.

CW1:        It's ready for DCAP [project review] and DUMITRU
            [CURESCU] called me last week and had indicated
            something to me about me expediting that drawing, but as a

50

courtesy I just wanted to let you know because I didn't want to take the work away from you because the arrangement up front was, and it was an agreement that you would be doing the expediting when I'm finished with the zoning.

SCORTE:    No, no, what I told him was that if you wanted to do it - - Like I said I talked to, to DUMITRU. It's really his call in a sense where you know for us I mean our agreement is, is the same with him. So it's not going to hurt my bottom line at all. So you know just generally speaking on a project like this I would think that we'd want to get it in and out of the system. So if I have -- if we're doing it I can just have Individual D go down (inaudible). If there's any OPR's [Open Plan Reviews with the DCAP reviewers] we can just set them up directly. So I think he's just going to expedite it if we do it. Do you know what I mean?

CW1:    Okay. So then you're fine with doing the expediting on this?

SCORTE:    Yeah, yeah.

CW1:    So we're close to wrapping up the zoning. Zoning is approved for the most part.

SCORTE:    Okay when, when landscaping goes through and it's all done we'll set up the [DCAP intake appointment] and take it from there.

CW1:    Okay.

65. On September 5, 2007 at approximately 11:53 am, CW1 called DUMITRU

CURESCU.  The call was consensually recorded and I have reviewed the recording. CW1 and CURESCU discussed the status of the zoning approval, DCAP review and payment of the bribe for the Granville project.

CW1:          I just wanted to let you know that I've been into zoning today and my paperwork which shows that they've agreed to give you the 15 units, which would be three basement units and the only thing that I'm waiting for is for [named individual] to address the landscape corrections.

D. CURESCU:   Okay.  The three units and three basement, but I got 13 units right now that I you know they're legal.  The only two extra basement, those are the ones that we're talking about to be zoned.

CW1:          (Inaudible) because there's one there that's already legal.

D. CURESCU:   There is one that is legal, right.  So we -- we're talking about two [illegal dwelling units in the basement].

CW1:          It's a total of 15.

D. CURESCU:   Yes, yes.  So it's good.

CW1:          So that's how the report is reading and that's how the zoning sheet that I have.

D. CURESCU:   Okay.

CW1:          Where it shows units total.  And then one more thing.  I spoke with TEO [SCORTE] today and I had mentioned to him that you brought up to me expediting that project and the original, original agreement was that he was going to do the expediting and I didn't want to take that away from him and he's fine with that.  So as soon as I'm done with the

zoning then TEO will take over and do the expediting.

D. CURESCU:     Then that's fine. That's okay. I just thought that that will --

if you take care of thing would quicken things because you

are there.

CW1:            Okay. Well TEO is going to take over and I -- when I'm

done with my zoning end.

D. CURESCU:     Do you know how long would it take you to do the

expediting to get me all the permits?

CW1:            It'll go into DCAP and then it'll be monitored on his end - -

and make sure that it gets reviews done. And then if there

are corrections he can go with the self cert program, which

he as an architect will insert.

D. CURESCU:     Okay then. Okay then I'll let him do the expediting and

you just do what we talked about.

CW1:            What I need to do is possibly meet up with you tomorrow

to give you this paperwork and settle out the financial end

because I have the necessary paperwork in my possession

that shows it's approved for 15 units. So once it -- once the

landscape gets resolved I take it in for the zoning stamp.

D. CURESCU:     Okay. Do you have the zoning stamp yet or you don't?

CW1:            No, but I have the zoning paperwork that shows it's been

approved by zoning.

D. CURESCU:     Okay. I will feel more comfortable. I could see you

tomorrow it's not a problem for me. I would feel more

comfortable when I have the whole thing in my hand.

CW1:            Okay. Well then make sure you follow up with Individual

53

F and tell him to speed things up so I can get it back into

zoning and get the stamp put on there.

D. CURESCU:    Okay. I'm going to call him right now.

66. On September 20, 2007 at approximately 10:09 am, CW1 called DUMITRU

CURESCU. The call was consensually recorded and I have reviewed the recording.

CW1 discussed the completion of the zoning approval and the bribe payment for the

Granville property with CURESCU.

CW1:    Granville zoning [was] approved for 15 units. So I wanted

to meet up with you some time today and give you the

[stamped, approved architectural] drawing so you can also

give it to TEO [SCORTE] for the expediting. Because I

have a meeting up north too and I was thinking maybe over

by Touhy and Cicero. Is it possible to meet over there?

D. CURESCU:    Yeah, I don't see any problem, yeah.

CW1:    All right DUMITRU. I'll call you at 11:30 when I'm on my

way. Do you know, do you know how much you're

supposed to bring?

D. CURESCU:    Yes, I do.

67. On September 20, 2007, agents conducted a surveillance of the Shell Gas Station

located at Touhy and Cicero. At approximately 11:45 am, DUMITRU CURESCU was

observed parked at the Shell Gas Station. Shortly thereafter, agents observed LAVINIA

CURESCU drive into the Shell Gas Station lot. LAVINIA CURESCU exited her vehicle

and handed an envelope to DUMITRU CURESCU. LAVINIA CURESCU returned to

her vehicle and drove away. At approximately 11:55 am, DUMITRU CURESCU pulled

out of the Shell Gas Station and drove away.

68. On September 20, 2007 at approximately 11:59 am, CW1 called DUMITRU

CURESCU. The call was consensually recorded and I have reviewed the recording.

| | |
|---|---|
| CW1: | Hi, DUMITRU. I'm here. I'm right at the front door of the Shell Station. |
| D. CURESCU: | Yeah, something came up and I can't make it there. If you want to go to the office and leave the, leave the plans there and we'll catch up later. |
| CW1: | Okay. |
| D. CURESCU: | All right? |
| CW1: | Well I don't know if that's possible. I have the drawings here. Does LAVINIA have the paperwork [cash]? |
| D. CURESCU: | I will meet with you after you leave the plans at the office. Go over at the office, there's a secretary in there. You could leave the plans with her. |
| CW1: | Okay and then call you when I leave the office? |
| D. CURESCU: | Yeah, call, call me when you -- call me when you left the plans there at the office. |
| CW1: | Okay. All right. |

69. On September 20, 2007 at approximately 12:25 pm, CW1 dropped off the Granville property stamped, approved architectural drawings at DUMITRU CURESCU's office located at 4747 West Peterson, Chicago, Illinois. Agents conducted a surveillance of the location. CW1 was observed entered the office building carrying the architectural plans for the Granville property and exiting the building without the architectural plans.

70. On September 20, 2007 at approximately 12:32 pm, CW1 called DUMITRU CURESCU. The call was consensually recorded and I have reviewed the recording. CW1 told CURESCU that he/she dropped off the drawing at CURESCU's office, and CURESCU said that he would "get back to" CW1.

71. On September 20, 2007 at approximately 5:04 pm, CW1 called DUMITRU

CURESCU. The call was consensually recorded and I have reviewed the recording.

CW1: Hi. I really couldn't talk earlier because I got kind of busy. But I was calling because I wanted to know what happened. What was the problem with the money matters on that project for Granville? I did what --

D. CURESCU: You'll have, you'll have somebody to stop by to see you. I just took off because I thought it was, it wasn't good for me. I saw something there that I didn't like at all.

CW1: Oh, okay.

D. CURESCU: Okay?

CW1: So I mean who's going to stop by to see me?

D. CURESCU: Somebody will stop by to see you, somebody that you know.

CW1: Okay.

D. CURESCU: They got me, they got me -- I don't like to talk on the phone. I think there is a problem that is in, in the air. You know and it's probably, you know better not to talk, but you'll be taken care of.

CW1: Okay, so --

D. CURESCU: All right?

CW1: -- this person is going to call me, or?

D. CURESCU: This person will stop by and you will see somebody that you, you know.

CW1: Okay. All right, DUMITRU.

72. On September 20, 2007 at approximately 5:36 pm, CW1 called [CURESCU

employee Individual H]. The call was consensually recorded and I have reviewed the recording. CW1 called Individual H because CW1 suspected that Individual H was the person that DUMITRU CURESCU said would stop by to see CW1.

CW1:            Hi, it's [CW1]. Okay. How are you doing?

INDIVIDUAL H: Good. Good. Very good.

CW1:            I have a question for you.

INDIVIDUAL H: Yes.

CW1:            DUMITRU [CURESCU] made me kind of nervous and he said that someone was going to drop off a package to me today and I was wondering if he spoke to you about dropping something off to me?

INDIVIDUAL H: Uh-huh, I'm going to -- I'm going to explain to you.

CW1:            Okay.

INDIVIDUAL H: What was the problem yeah, and he called me a couple minutes and maybe I'm going to stop at your place tonight.

CW1:            Okay. What I was going to suggest is you know he was saying something about he didn't like what he saw at the gas station and I don't know what he's talking about.

INDIVIDUAL H: I'm -- it's, it's okay for you and for him so I'm going to tell you.

CW1:            Okay. All right speak.

INDIVIDUAL H: It was, it was better like this. I'm going to explain to you. No problem. I'm going to stop tonight because I'm going to leave in the middle of the night to -- for Wisconsin and I'm coming back just, just Sunday. And DUMITRU he told me, he says [INDIVIDUAL H] please go over there

57

because I promised something for [CW1] and la, la, la, la
like this, but it was different his story. I want to explain to
you.

CW1:    Okay because what I was going to tell you is if he's saying
that you know he didn't like what he saw I don't want
anybody following you up to my house or anybody coming
here, if DUMITRU said that he saw something that he
didn't like over there at the gas station. What if they follow
you up here? I mean I'm worried about my house here,
[INDIVIDUAL H]. I don't want somebody following you,
you know and then me getting in trouble.

INDIVIDUAL H:  Yes.

CW1:    So what I was going to suggest can we just maybe meet at
the -- you know the oasis there when you go on the 94 by
the gas station and you stop for food? It's, it's almost near
like Town Line Road. Maybe I could meet you up there at
8:00 o'clock tonight. Is that okay?

INDIVIDUAL H:  Okay. Okay.

CW1:    Because DUMITRU's got me nervous and I don't, I don't
want -- you know what if somebody follows you to my
house [INDIVIDUAL H]?

INDIVIDUAL H:  Yeah, yeah, yeah. That's why I'm going to explain
(inaudible).

73. On September 20, 2007 at approximately 7:14 pm, Individual H called CW1. The
call was consensually recorded and I have reviewed the recording. Individual H told
CW1 that instead of meeting at the gas station, CW1 might have to meet DUMITRU

58

CURESCU the following day at his office.

74. On September 20, 2007 at approximately 7:24 pm, CW1 called Individual H. The call was consensually recorded and I have reviewed the recording.

CW1:            Hi, [Individual H].

INDIVIDUAL H: Yes, hi.

CW1:            So what did he [DUMITRU CURESCU] say?

INDIVIDUAL H: Yes, 9:30.

CW1:            9:30 tomorrow at his office?

INDIVIDUAL H: Yes.

CW1:            Okay.  He didn't give you the package [containing the money]?  Because I'm almost at the oasis.  Do you want me to wait for you here or he didn't give you the package?

INDIVIDUAL H: He give it to you.

CW1:            He's going to give me the package?

INDIVIDUAL H: Yes.  Yes.  Yes.

CW1:            Okay.  All right [Individual H].  Because I don't want to put you in the middle of this, so I'll meet him at his office tomorrow morning.

INDIVIDUAL H: Okay.  He says it's going to work for you over there.

CW1:            Okay.  All right, no problem.

75. On September 21, 2007 at approximately 9:35 am, CW1 met with LAVINIA CURESCU at CURESCU's office located at 4747 West Peterson in Chicago, Illinois. Prior to the meeting with LAVINIA CURESCU, CW1 met with agents at a briefing location. CW1 drove CW1's vehicle to the meeting location at 4747 West Peterson and agents followed CW1 to the meeting location. The meeting was not audio recorded due a concern that CW1 would be searched at the meeting. Surveillance agents observed CW1

walking into 4747 West Peterson, and observed him/her walk out of the building approximately 10 minutes later. CW1 then drove to a debriefing location followed by agents. At the debriefing location, CW1 reported to agents that LAVINIA CURESCU handed an envelope to CW1 at the meeting but did not make any statements to CW1. CW1 gave agents the envelope that CW1 said CW1 received from LAVINIA CURESCU. Agents determined that the envelope contained $10,000 cash.

### *Plumbing violations at the Granville property*

76. On December 13, 2007 at approximately 11:38 am, a call from BENY GARNEATA to [a City of Chicago Plumbing Inspector, hereafter referred to as Individual J] was intercepted on Target Phone 3.[7] GARNEATA asked Individual J if MARIO OLIVELLA was there. Individual J said that he wasn't sure where OLIVELLA was. GARNEATA asked Individual J to have OLIVELLA contact him regarding 1637 West Granville. Individual J said "Ahh, yes." GARNEATA asked Individual J if he knew about this. Individual J said yes if it's the one he's thinking of. Individual J said that he'll have OLIVELLA give GARNEATA a call. GARNEATA said that he wants to know [from OLIVELLA] if it is a major problem because the owner [DUMITRU CURESCU] wants them [Garneata's company, M-3 Plumbing] to take over the job and GARNEATA wanted to see exactly what the problem is.

77. On December 13, 2007 at approximately 1:29 pm, a call from BENY GARNEATA to VASILE [8] was intercepted on Target Phone 1. GARNEATA told FOFIU that he called him [OLIVELLA] yesterday, but didn't leave a message.

---

[7] Target Phone 1 and Target Phone 3 are subscribed to in the name of one of Beny Garneata's businesses, M-5 Electrical Contracts. Both phones are known to be used by GARNEATA based on consensually recorded calls made by CW1. In addition, I personally overheard GARNEATA speaking in my presence while conducting surveillance of him on December 18, 2007.

[8] Information establishing VASILE FOFIU as the user of 773-968-7001 includes the following. FOFIU has left voicemail messages indicating that it was VASILE calling GARNEATA on Target phone 1 and Target phone 3 and asking GARNEATA to return his call.

GARNEATA said that he would call him [OLIVELLA] now and try to resolve everything. After he spoke to him [OLIVELLA], he said he would call [Individual K, who worked for GARNEATA].

78. On December 14, 2007 at approximately 5:51 pm, a call from MARIO OLIVELLA[9] to BENY GARNEATA was intercepted on Target Phone 1. OLIVELLA said that he spoke to Individual J about the Granville project. OLIVELLA informed GARNEATA that any plumbing work that had been installed needed to be removed. GARNEATA replied, "Oh, shit." OLIVELLA asked what plumbing work had been installed. GARNEATA said that there had been a lot of plumbing work installed and that it was all cast iron. OLIVELLA said that the plumbing work was all underground and that it was all supposed to be exposed. GARNEATA agreed with OLIVELLA. OLIVELLA asked if it [concrete] had been poured already [over the pipes]. GARNEATA said yes. OLIVELLA said that he [the owner] shouldn't have done that. GARNEATA said that the owner [DUMITRU CURESCU] had a plumber and the plumber pulled out of the job. OLIVELLA said that was because he was playing games. OLIVELLA asked GARNEATA if he would be in the office tomorrow. GARNEATA said that he was out of town, but that he needs to help this guy [DUMITRU CURESCU] because he is his worker's [VASILE FOFIU's] brother. OLIVELLA asked GARNEATA when he would be back in town. GARNEATA said on Sunday. OLIVELLA said that they would plan to "hook up" Monday afternoon. GARNEATA asked OLIVELLA if he could tell the guy [DUMITRU CURESCU] to be at peace with his mind this weekend. OLIVELLA said to GARNEATA to have him hang on. OLIVELLA asked GARNEATA

---

[9] Information establishing MARIO OLIVELLA as the user of 312-446-5401, 312-743-3566, and 773-255-3230 includes the following. Telephone number 773-255-3230 is subscribed to in the name of MARIO OLIVELLA. On October 18, 2007, CW1 called 312-743-3566 and 312-446-5401. These calls went to voicemail. The message indicates that the caller had reached the phone of Mario Olivella, plumber in charge. In addition, I personally overheard OLIVELLA speaking in my presence while conducting surveillance of OLIVELLA on December 18, 2007.

if he was dealing with the owner, and GARNEATA replied that he was dealing directly with the owner. OLIVELLA said that the owner had another guy, TEO [SCORTE], involved as an expediter and that TEO was supposed to be running the job. GARNEATA said that he didn't know TEO. OLIVELLA said that was where part of the problem was coming from. OLIVELLA told GARNEATA to talk to the owner to find out about TEO and what his involvement was with the project. OLIVELLA said that he and GARNEATA would discuss things on Monday.

79.    On December 17, 2007 at approximately 9:19 am, a call from BENY GARNEATA to VASILE FOFIU was intercepted on Target Phone 1. FOFIU asked GARNEATA if he talked to the guy [OLIVELLA]. GARNEATA said that he talked to MARIO [OLIVELLA] on Saturday and OLIVELLA mentioned something about TEO [SCORTE]. FOFIU said to GARNEATA that TEO is the owner because TEO was the one that called downtown and the situation is very complicated. GARNEATA said that he was meeting this afternoon with OLIVELLA in his office. GARNEATA said that OLIVELLA wanted to come to his office because he doesn't want to use the phone in situations like this, it's very dangerous. GARNEATA said that OLIVELLA would be doing the inspection. FOFIU informed GARNEATA that he [DUMITRU CURESCU] wants the plumbing material to stay the same and he will pay how much will cost him to handle the job [asking how much the bribe will be]. FOFIU said that he would be the one controlling the job.

80. On December 18, 2007 at approximately 10:09 am, a call from VASILE FOFIU to BENY GARNEATA was intercepted on Target Phone 1. FOFIU asked GARNEATA if he talked to OLIVELLA yesterday. GARNEATA said that he didn't because OLIVELLA wasn't able to come [to the office]. GARNEATA said that he would be meeting with OLIVELLA today at 4 pm. GARNEATA told FOFIU not to worry because MARIO told GARNEATA that he would resolve the problem.

81. On December 19, 2007 at approximately 10:02 am, a call from BENY GARNEATA to VASILE FOFIU was intercepted on Target Phone 1. GARNEATA said that he talked to him [MARIO OLIVELLA] and he [OLIVELLA] would meet with him in the afternoon at the job.   FOFIU asked what time they would be meeting. GARNEATA said that it would be after 12:00 pm.

82. On December 19, 2007 at approximately 11:04 am, a call from VASILE FOFIU to GARNEATA's voicemail was intercepted on Target Phone 1. FOFIU left a message for GARNEATA that he was at Mitru's [DUMITRU CURESCU's] building [at 1637 West Granville] and [a City of Chicago Plumbing Inspector, hereafter referred to as Individual L] just pulled up to the building. FOFIU wanted GARNEATA to call him back.   In the background, FOFIU said to another person [presumably DUMITRU CURESCU] that was why he was calling GARNEATA, to see if GARNEATA was coming with the other one [plumbing inspector MARIO OLIVELLA].

83. On December 19, 2007 at approximately 12:33 pm, a call from BENY GARNEATA to VASILE FOFIU was intercepted on Target Phone 1. FOFIU said that Individual L asked them who was going to be in charge of it [the plumbing work]. FOFIU told him that they [GARNEATA's company, M-3 Plumbing] may be in charge and then after that he left.   GARNEATA said that he knew about it [the plumbing inspection] from MARIO OLIVELLA.   FOFIU asked GARNEATA if he's going there. GARNEATA was waiting for his [OLIVELLA's] call. FOFIU wanted GARNEATA to call him ahead of time so he can call Mitru [DUMITRU CURESCU] to be there. GARNEATA said that he wanted him [CURESCU] there as well.

84. On December 19, 2007 at approximately 2:22 pm, a call from VASILE FOFIU to BENY GARNEATA was intercepted on Target Phone 1.   GARNEATA said that he [OLIVELLA] didn't call him yet.   FOFIU said that he had been waiting all day for GARNEATA's call. FOFIU had to go all the way to Dempster and Golf and that it's too

63

far for him to come back. FOFIU told Mitru [DUMITRU CURESCU] to wait around for him. GARNEATA said that he will call him [OLIVELLA] to see if he could come by later. GARNEATA said that he would call FOFIU back in 5 minutes. FOFIU said it would be okay if he came tomorrow as long as he knew something about it [ahead of time].

85. On December 19, 2007 at approximately 2:23 pm, a call from BENY GARNEATA to MARIO OLIVELLA was intercepted on Target Phone 1. OLIVELLA said that he would call GARNEATA right back and hung up.

86. On December 19, 2007 at approximately 2:23 pm, a call from BENY GARNEATA to VASILE FOFIU was intercepted on Target Phone 1. GARNEATA said that he [MARIO OLIVELLA, based on the previous call] was in a meeting downtown and that's the reason why he didn't call GARNEATA back. GARNEATA and FOFIU agreed to leave it for tomorrow.

87. On December 19, 2007 at approximately 4:57 pm, a call from MARIO OLIVELLA to BENY GARNEATA was intercepted on Target Phone 1. OLIVELLA apologized for not being able to speak to GARNEATA earlier. GARNEATA said that Individual L was there today. OLIVELLA said that he did not speak to Individual L this morning because he was in and out too quick, but that he spoke with the "chief" [City of Chicago Chief Plumbing Inspector, hereafter referred to as Individual M] and he [OLIVELLA] plans to go there tomorrow morning with GARNEATA. MARIO will call GARNEATA tomorrow when things slow down and they can go. GARNEATA said thank you and that he wanted to take care of the problem. MARIO said that he would talk to him tomorrow.

88. On December 19, 2007 at approximately 6:27 pm, a call from BENY GARNEATA to VASILE FOFIU was intercepted on Target Phone 1. During the conversation, GARNEATA said that he talked to OLIVELLA and OLIVELLA will be

there [at the Granville project] between 11 and 12.

89. On December 19, 2007 at approximately 7:09 pm, a call from [a contractor, Individual N] to GARNEATA was intercepted on Target Phone 1. During the conversation, Individual N asked GARNEATA if he was taking over [DUMITRU] CURESCU's job [at 1637-39 West Granville]. GARNEATA said that VASILE FOFIU's sons were selling the units for CURESCU and CURESCU asked FOFIU to talk to GARNEATA to see if GARNEATA could help him out. GARNEATA said that FOFIU was taking over the job and not him. GARNEATA wanted to talk to Individual L and MARIO OLIVELLA before he did anything. Individual N said that he had the job first but dropped it. Individual N said that CURESCU was talking only crap with him. Individual N said that he had a job at 1900 Grand Avenue and that the union guys were stopping by all of the time. That was where they [the union officials] found out about it [the Granville project]. Individual N had an inspection today with Individual L and Individual L told Individual N that he talked to the foreman and he told Individual L that they took over the job. GARNEATA said that he always talked to the supervisor and the district inspectors. GARNEATA said that he took OLIVELLA to the Bulls game last night and they talked about this problem. Individual N said that it was CURESCU's fault because he talks too much. GARNEATA said that he was having an inspection at the Granville project tomorrow after 12 noon with OLIVELLA. Individual N said that they are selling condominiums [at the Granville project] even though they don't have the CO [Certificate of Occupancy] or the blueprints for it. Individual N said that he told an unidentified male (UM) that he's not union and can't do it. Individual N will meet with him [CURESCU] and let him know that Garneata can do the plumbing for him.

90. On December 20, 2007 at approximately 10:36 am, OLIVELLA called GARNEATA on Target Phone 1 and asked GARNEATA if he could meet him at the Granville property in about an hour. GARNEATA agreed to meet OLIVELLA. At

approximately 11:26 am, GARNEATA called FOFIU from Target Phone 1. GARNEATA asked FOFIU where FOFIU was located because GARNEATA was at 1637 (Granville).

91. On December 20, 2007, agents conducting surveillance of GARNEATA observed and photographed BENY GARNEATA meeting with MARIO OLIVELLA, VASILE FOFIU and a fourth individual at the 1637 Granville property at approximately 11:47 a.m.  From approximately 12:06 pm to 12:11 pm, agents observed GARNEATA and OLIVELLA have a discussion next to OLIVELLA's vehicle, outside of the presence of FOFIU and the fourth individual.

92. Immediately after leaving the property, at approximately 12:11 pm, GARNEATA called FOFIU from Target Phone 1 and, in summary, told FOFIU that OLIVELLA wanted a $7,000 bribe payment. More specifically, GARNEATA told FOFIU, "He (Olivella) and I came up with a figure that he likes....I don't really like the amount, but we have no other way of doing it.  This amount is for the whole job."[10]  FOFIU told GARNEATA to talk to "Mitru" (DUMITRU CURESCU) about the amount, but GARNEATA told FOFIU that GARNEATA would be talking to FOFIU because FOFIU brought GARNEATA to the Granville project.  GARNEATA told FOFIU, "You tell him (CURESCU) that it will cost him (CURESCU) $7,000, that's how much he (OLIVELLA) wants."  GARNEATA told FOFIU, "if you can bring it tomorrow, then we can resolve the whole thing."  A few minutes later, FOFIU called GARNEATA on Target Phone 1 and told GARNEATA that "he would talk to Mitru (DUMITRU CURESCU) tomorrow to see where he's going to get the money from."

93. On December 20, 2007 at approximately 1:22 pm, a call from FOFIU to

---

[10] Recorded conversations between FOFIU and GARNEATA frequently took place in the Romanian language.  In those instances where the recorded conversation took place in whole or in part in the Romanian language, a translation of the conversation to the English language was prepared and provided to me by an FBI language specialist.

GARNEATA was intercepted on Target Phone 1. During this call, FOFIU told GARNEATA that FOFIU had instructed DUMITRU CURESCU to deliver the $7,000 bribe payment and permit to FOFIU on Monday, December 24. GARNEATA told FOFIU that they needed to arrange to get the payment and permit to OLIVELLA the following day, Friday, December 21. During this conversation, FOFIU stated to GARNEATA, "I told him (DUMITRU CURESCU) to show up on Monday (December 24) with $7,000 and the permit, okay?" GARNEATA told FOFIU, "I need it ($7,000) tomorrow, not Monday.... Bring the permit and the $7,000." FOFIU agreed to make it happen.

94. The next morning, December 21, 2007 at approximately 7:58 am, a call from OLIVELLA to GARNEATA was intercepted on Target Phone 1. GARNEATA told OLIVELLA that they would "meet later on this afternoon." OLIVELLA replied that that was "fine." OLIVELLA asked if GARNEATA had an "approximate time this afternoon," and GARNEATA replied, "Not until I'm called up. But will probably late in the afternoon. You will hear from me."

95. On December 21, 2007 at approximately 10:45 am, a call from GARNEATA to FOFIU was intercepted on Target Phone 1. GARNEATA asked FOFIU, "What time are we going to meet with Mitru (DUMITRU CURESCU)." GARNEATA also stated, "I told him (OLIVELLA) that today we are going to meet with him." FOFIU stated, "When Mitru's daughter gets out from school, he (CURESCU) is going to call me. He has everything prepared." Based upon the context of this and other conversations, as well as the investigation to date, I understand that FOFIU told GARNEATA that CURESCU had gathered the bribe money and permit ("he has everything together") and that CURESCU would call FOFIU to arrange a meeting with GARNEATA and FOFIU after CURESCU's daughter got out of school.

96. On December 21, 2007 at approximately 3:14 pm, a call from GARNEATA to

FOFIU was intercepted on Target Phone 1. FOFIU told GARNEATA, "I called you because I wanted to set up a meeting with the three of us (GARNEATA, FOFIU and DUMITRU CURESCU). And I also called Mitru (CURESCU), but Mitru didn't call me back yet." GARNEATA and FOFIU agreed to meet at a Starbucks at Lincoln and Kedzie. FOFIU said he would call GARNEATA as soon as he heard from DUMITRU CURESCU.

97. The next call intercepted on Target Phone 1, at approximately 3:19 pm, was a call from GARNEATA to OLIVELLA. GARNEATA asked OLIVELLA, "After 4 o'clock, okay?" OLIVELLA said that was all right and agreed to call GARNEATA when OLIVELLA was coming towards GARNEATA's office.

98. At approximately 3:28 pm, a call from FOFIU to GARNEATA was intercepted on Target Phone 1. FOFIU told GARNEATA to be at the Starbucks on Lincoln and Kedzie in fifteen minutes. GARNEATA told FOFIU that he would see him there in 20 to 30 minutes. Based upon the context of this conversation and subsequent observations by agents, I believe that FOFIU had just spoken to DUMITRU CURESCU and arranged for CURESCU to meet with FOFIU and GARNEATA so that CURESCU could deliver the $7,000 bribe payment and permit to GARNEATA so that GARNEATA could deliver the same to OLIVELLA.

99. At approximately 3:57 pm, GARNEATA was observed and photographed with VASILE FOFIU and DUMITRU CURESCU at the Starbucks located at Lincoln and Kedzie. Based on the recorded conversations, the purpose of this meeting was for CURESCU to give the $7,000 cash for OLIVELLA's bribe to GARNEATA; however, from their covert vantage point, the surveillance agents could not see cash or an envelope being passed from CURESCU to GARNEATA.

100. On December 21, 2007, at approximately 4:45 pm, a call from BENY GARNEATA to MARIO OLIVELLA was intercepted on Target Phone 1. OLIVELLA

answered, "Yes sir," and GARNEATA informed OLIVELLA that he was 20 minutes away from GARNEATA's office. OLIVELLA told GARNEATA that he was already right in front of GARNEATA's office.

101.    On December 21, 2007 at approximately 5:04 pm, a call from GARNEATA to OLIVELLA was intercepted on Target Phone 1. GARNEATA told OLIVELLA that he was "in the office" and instructed OLIVELLA to "come in." At approximately 5:05 pm, surveillance agents observed and photographed OLIVELLA entering GARNEATA's office at 6043 North Milwaukee Avenue. At approximately 5:18 pm, OLIVELLA was observed leaving GARNEATA's office and sitting in his car for 1-2 minutes before driving away. Surveillance agents did not observe OLIVELLA carrying anything in his hands when entering or leaving GARNEATA's office. However, based on previously intercepted calls, the purpose of this meeting was for GARNEATA to pass a $7,000 bribe payment from CURESCU to OLIVELLA and to have OLIVELLA sign the building permit.

102.    On December 22, 2007 at approximately 10:00 am, a call from FOFIU to GARNEATA was intercepted on Target Phone 1. GARNEATA told FOFIU, "Come over so I can give you the permit (for the Granville property) because he (OLIVELLA) signed it." FOFIU told GARNEATA that he was coming and agreed to meet GARNEATA at GARNEATA's office.

103.    On December 26, 2007 at approximately 2:42 pm, a call was intercepted on Target Phone 1. GARNEATA was checking his voicemail messages. GARNEATA reviewed a message from MARIO OLIVELLA. OLIVELLA wanted to know if Garneata was ready at [1637 West] Granville [for the inspection]. OLIVELLA said that GARNEATA should give [Chief plumbing inspector G] a call on his cell phone if they are ready.

104.    On December 27, 2007 at approximately 8:06 am, a call from MARIO

OLIVELLA to BENY GARNEATA was intercepted on Target Phone 1. OLIVELLA asked GARNEATA if Granville was ready [for inspection] because the boss [Individual M] was asking.

105.    On December 28, 2007 at approximately 7:55 am, a call from MARIO OLIVELLA to BENY GARNEATA was intercepted on Target Phone 1.

| | |
|---|---|
| OLIVELLA: | What's it look like on [1637 West] Granville? |
| GARNEATA: | Granville? We can meet over there at 1:30, 1:45. |
| OLIVELLA: | Can you make it earlier? Because Individual M is going up there, not me. |
| GARNEATA: | What time? How early? |
| OLIVELLA: | Probably he's trying to get - - probably around 11 o'clock or so. |
| GARNEATA: | That's bad for me. One thirty is better for me. |
| OLIVELLA: | Are you done by one [with your workout]? Well, he's gonna be stuck in snow. |
| GARNEATA: | Tell him no. We will shovel the snow for him while he's driving. He's a chief so he should remember. The plumbers are there to have the right with the plow in the front. |
| OLIVELLA: | Yeah. Okay. |
| GARNEATA: | [Laughing] |
| OLIVELLA: | Can you make it any sooner than that? |
| GARNEATA: | Let me call you back in the next 45 minutes. |
| OLIVELLA: | Alright. Call me back. |

106.    On December 28, 2007 at approximately 8:37 am, a call from BENY GARNEATA to VASILE FOFIU was intercepted on Target Phone 1. GARNEATA and

70

FOFIU were speaking in Romanian. The call was transcribed by a Romanian translator.

GARNEATA:    This guy wants to come there [the Granville property] at 11:00 o'clock, Individual M. But the problem is that I can't be there at eleven. Somebody else should be there to meet him at least.

FOFIU:    Who should be there?

GARNEATA:    You. I thought of calling you and send you there. To meet with him.

FOFIU:    Okay.

GARNEATA:    Okay? Can you, can you handle this matter or it's going to be a problem?

FOFIU:    I will be there. Don't worry. You are gonna give it [the contractor letter] or am I going to? How are we going to do it?

GARNEATA:    You are gonna give it to him. You're gonna give him the permit as well. Okay?

FOFIU:    Sure. We're gonna give him the pictures and the videotape?

GARNEATA:    Yes. Give him the pictures and the videotape.

FOFIU:    Good.

107.    On December 28, 2007 at approximately 8:40 am, a call from BENY GARNEATA to MARIO OLIVELLA was intercepted on Target Phone 1.

GARNEATA:    My guy, VASILE [FOFIU], will meet him [Individual M] over there [at the Granville property].

OLIVELLA:    Okay.

GARNEATA:    At 11:00 o'clock. In front of the building.

71

OLIVELLA:    Okay. I will let him [Individual M] know.

GARNEATA:    And he will have the cassette. He'll have the pictures. He'll have the [building] permit and he's gonna have my letter. He's gonna have my letter for the company.

OLIVELLA:    I'll let him know.

108.  On December 28, 2007 at approximately 8:41 am, a call from BENY GARNEATA to VASILE FOFIU was intercepted on Target Phone 1. GARNEATA and FOFIU were speaking in Romanian. The call was transcribed by a Romanian translator.

GARNEATA:    He'll [Individual M] be in front of the building at 11 o'clock. You better be there. I told him [MARIO OLIVELLA] that you're gonna give him all the items [building permit, video cassette, pictures and letter from GARNEATA's company]. The ones that I talked to you about.

FOFIU:    Okay. Good.

GARNEATA:    Thank you. Any questions, call me. Leave me a message if you have any problems.

FOFIU:    Yeah.

GARNEATA:    Okay? That's why (inaudible) because it's all arranged.

FOFIU:    Okay. Good.

109.  On December 28, 2007, agents conducted surveillance at the Granville property. At approximately 11:00 am, surveillance agents observed and videotaped VASILE FOFIU and DUMITRU CURESCU meeting with Individual M at the Granville property.

110.  On December 28, 2007 at approximately 1:27 pm, a call from BENY GARNEATA to VASILE FOFIU was intercepted on Target Phone 1. During the

72

conversation, FOFIU informed GARNEATA that all went well [with the inspection at the Granville property]. Individual M signed [the building permit] and told FOFIU to hold on to the pictures because he didn't need them. He said to make sure he has them available in case somebody is asking for them.

111.    A review of the City of Chicago permit application records disclosed that the contractor's estimate of the value of the work to be performed at the Granville property was $500,000.

112.    A review of City of Chicago records and the City's web site disclosed that the City of Chicago is a unit of local government that received in excess of $10,000 in federal funding in a twelve-month period from December 28, 2006 through December 28, 2007.

113.    Based on the facts described above, I submit that there is probable cause to believe that DUMITRU CURESCU, LAVINIA CURESCU, VASILE FOFIU, BENY GARNEATA, MARIO OLIVELLA, TEOFIL SCORTE and WILLIAM WELLHAUSEN did conspire with each other and others to bribe City of Chicago officials with respect to the property located at 1637-39 West Granville, in violation of Title 18, United States Code, Section 666, all in violation of Title 18, United States Code, Section 371.

David Hodapp
Postal Inspector, U.S. Postal Inspection Service

Subscribed and sworn to me this
_ day of May, 2008:

Martin C. Ashman
U.S. Magistrate Judge