# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 08 CR 398 |
| | ) | |
| | ) | Hon. Joan H. Lefkow |
| | ) | |
| DUMITRU CURESCU, | ) | |
| | ) | |
| Defendant. | ) | |

## REVISED OPINION AND ORDER

Dumitru Curescu was convicted of conspiracy to bribe a City of Chicago zoning inspector (Count I) and bribery of a zoning inspector (count IV) in violation of 18 U.S.C. §§ 2, 371, and 666(a)(2). Before the court are Curescu's post-trial motions for judgment of acquittal and a new trial. For the following reasons, the motions [#394, 395] will be denied.

## LEGAL STANDARDS

Federal Rule of Criminal Procedure 29 provides, in pertinent part, that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When requesting a judgment of acquittal under Rule 29, a defendant "faces a nearly insurmountable hurdle [because] . . . [the court] consider[s] the evidence in the light most favorable to the Government, defer[s] to the credibility determination of the jury, and overturn[s] a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States* v. *Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (quoting

*United States* v. *Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)); *see also United States* v.

*Benjamin*, 116 F.3d 1204, 1206 (7th Cir. 1997).

Under Federal Rule of Criminal Procedure 33, a court may grant a new trial "if the interest of justice so requires." "The decision to grant or deny a motion for new trial rests within the sound discretion of the trial court." *United States* v. *Reed*, 875 F.2d 107, 113 (7th Cir. 1989). The court may grant a new trial "in a variety of situations in which trial errors or omissions have jeopardized the defendant's substantial rights." *United States* v. *Reed*, 986 F.2d 191, 192 (7th Cir. 1993) (citation omitted). Such motions are disfavored and are granted only in extreme cases. *See, e.g.*, *United States* v. *Linwood*, 142 F.3d 418, 422 (7th Cir. 1998). To justify a new trial, an evidentiary ruling must be not only error but harmful error. *United States* v. *Owens*, 424 F.3d 649, 653 (7th Cir. 2005) ("[W]hen reviewing evidentiary errors, we will only reverse and order a new trial provided that the improper admission was not harmless, which is to say 'only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice.'" (quoting *United States* v. *Hernandez*, 330 F.3d 964, 969 (7th Cir. 2003))). In deciding whether a new trial should be granted under Rule 33, the court "may properly consider the credibility of witnesses, and may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States* v. *Washington*, 184 F.3d 653, 657 (7th Cir. 1999).

# ANALYSIS

## I. Motion for Judgment of Acquittal

### A. Evidence Presented at Trial

In 2007, Curescu purchased a vintage apartment building on Granville Avenue on the north side of Chicago to use as an investment property. Curescu planned to renovate the property, convert the apartments to condominiums, and then sell the condominiums. The building had only one apartment unit in the basement, and Curescu wanted to add two more garden apartments. Curescu was relatively inexperienced as a real estate developer but he did have substantial experience doing residential remodeling. He had also undertaken a similar project in 2006 when he renovated the basement of another apartment building on Maplewood Avenue and added four basement units to be sold as condos.

On June 20, 2007, Curescu called Catherine Romasanta, a professional expediter at City Hall, and asked if she could "make the papers" so that he could add a basement unit to the Granville property.[1] Curescu had hired Romasanta to help him obtain zoning approval for his renovation of the Maplewood property, with successful results. Unbeknownst to Curescu, however, in June 2007 Romasanta was cooperating with the federal government in an investigation into bribery at City Hall. Romasanta had informed the government that between 2003 and 2007 she passed approximately $187,000 in bribes to 25 or 30 City of Chicago employees in exchange for favorable treatment such as faster building inspections and inspectors' overlooking building code violations. Romasanta also passed bribes to city zoning

---

[1] Although Curescu initially told Romasanta that he wanted to add one dwelling unit to the Granville property, he eventually attempted to add two dwelling units.

inspectors in exchange for falsified reports that would allow her clients to circumvent the city's lengthy zoning amendment, or variance, procedures. Indeed, this is how Romasanta had obtained zoning approval for construction of four new basement units in the Maplewood building. As part of Romasanta's cooperation with the government, she agreed to allow all of her incoming and outgoing calls to be automatically recorded.

During the initial call on June 20, Romasanta asked Curescu whether he was "willing to pay whatever it takes" to get the necessary approval for the Granville basement units. Curescu responded, "Yeah, whatever the cost, definitely."

On June 28, 2007, Romasanta placed two calls to Curescu to discuss the Granville project. During their first conversation, Curescu told Romasanta that there were 13 "legal" dwelling units in the Granville property and that he wanted to "legalize" another unit. During the second call, Curescu and Romasanta had the following discussion regarding the "fee" for the zoning approval:

> Romasanta: I'm not sure what the fee's going to be on this, but can you give me an idea of what maximum you want to pay for each unit?
>
> Curescu: Well I think what we have done in the past will work with me.
>
> Romasanta: Okay, so I will let you know then. It's possible it might end up being $5,000 per unit.
>
> Curescu: I believe I gave you $4,000 per unit last time.
>
> Romasanta: Okay well we'll work on something with these guys. We'll see how it works out.
>
> Curescu: That's fine, that's fine whatever you know, just not to exceed $5,000. . . . Not to exceed $5,000 per unit.

Romasanta testified that when Curescu stated that he wanted to do "what we have done in the past," he meant that "he paid me a bribe of $4,000 per illegal dwelling unit for the previous project for 5700 North Maplewood."

On July 6, 2007, Romasanta called Curescu to discuss the preparation of architectural plans for the Granville project. Curescu stated that he and his architect, Teofil Scorte, would meet that day to decide "exactly how the . . . drawings are going to be, how the apartments are going to be divided and so forth."

On July 10, 2007, Romasanta and Curescu met with Scorte to discuss the architectural plans. They met at Scorte's office and Romasanta recorded the meeting. Scorte showed architectural drawings to Romasanta that falsely stated that the Granville property had three pre-existing dwelling units in the basement. Romasanta and Curescu again discussed the payments that would be made in order to obtain zoning approval for the two additional basement units. Romasanta asked Curescu what his "max" would be, "so I know where to cut off when I'm dealing with these guys." Curescu responded, "Well, see what they say and then I'll let you know. I imagine that they won't go sky high you know." Later on, Romasanta confirmed with Curescu, "Okay. So last time we did four. . . . So should I just say no higher than six or —?" The following exchange ensued:

Curescu:        No higher than five.

Romasanta:      No higher than five, okay. Okay. But that transaction will include
                the Department of Buildings also, if they have to change the
                number of units [in the City of Chicago's mainframe computer
                system]. Because I have to go to two departments. I don't know
                what you paid that person for Maplewood to get the printout
                [showing the number of pre-existing dwelling units in the city's
                mainframe computer], because I know you had mentioned they

|              | charged you quite a bit of money and you were really upset about it. |
| :--- | :--- |
|              | . . . |
|              | I just wanted to make sure we're on the same page with all of this. |
|              | . . . |
| Romasanta:   | I would say with that transaction maybe three. |
| Curescu:     | How about five and five and two? |
| Romasanta:   | Five and five and two, okay.  I'll keep that in mind.  And then my expedite – |
| Curescu:     | If it has to be three, it's going to be three. . . . Please work with this. . . . See because . . . that's how, how far I could go. |

Romasanta testified that in this conversation Curescu offered to pay two sets of bribes: (1) a $2,000 to $3,000 bribe to obtain a mainframe computer printout from the Department of Buildings that falsely stated that the Granville property had 15 original dwelling units, and (2) a bribe of $5,000 per illegal basement unit to a zoning inspector to approve the building as having 15 legal dwelling units.  During this same meeting, Romasanta asked Scorte whether he would be willing to take the application to the City of Chicago zoning department for approval.  Scorte, in Curescu's presence, stated, "in this particular project I would rather not [–] to be very honest . . . I don't want to know about it. . . . [W]hat's difficult is I don't want to know how it's going to get done."  Scorte testified that he was concerned that the Granville project might be investigated because they were "adding additional units in the basement that were not there."  Romasanta testified that, pursuant to her discussion with Scorte, she was going to get the zoning approval to add the two basement units to the Granville building and that Scorte would only handle expediting the permit after zoning had been approved.

On July 25, 2007, Romasanta called Curescu and told him that she had his "[computer] printout for Granville" and that "it was going to be . . . $2,500." Romasanta testified that the "printout" referred to a fraudulent printout from the mainframe computer at the buildings department and that "$2,500" referred to the "bribe payment" that she would normally have paid to a city official to change the information in the mainframe computer. Curescu agreed to meet with Romasanta and pay her $2,500. That afternoon, Romasanta met with Curescu's wife, Lavinia Curescu, at a gas station. Lavinia Curescu gave Romasanta $2,500 cash and received a copy of a mainframe computer printout that had been prepared with the assistance of federal investigators to falsely reflect 15 pre-existing dwelling units at the Granville property.[2]

In August of 2007, Romasanta arranged for William Wellhausen, a city zoning inspector, to visit the Granville property and write a report falsely stating that there were three pre-existing dwelling units in the basement of the property. Romasanta testified that she had paid approximately $30,000 in bribes to Wellhausen between 2005 and 2007 so that Wellhausen would add illegal dwelling units to the basements of apartment buildings, process certificate of occupancy approvals, and write favorable inspection reports. Wellhausen met with Curescu at the Granville property on August 29, 2007 and conducted his inspection. The meeting between Wellhausen and Curescu was videotaped but their conversations were not recorded. After the meeting, Wellhausen called Romasanta and told her that Curescu had "a bare basement" but that he was going to "fabricat[e] the other two ones" and make it appear in his report that there were three pre-existing dwelling units in the basement. Wellhausen explained that he was "giving

---

[2] Curescu was charged with one count of bribing a city official to obtain the fraudulent mainframe computer printout. There was a hung jury on this count, which the government has indicated it will not retry.

[Curescu] two extra ones that he is going to build." Wellhausen submitted his zoning inspection report on August 30, 2007, and the report falsely stated that the Granville property had 15 pre-existing dwelling units in total. The next day, Romasanta paid Wellhausen $8,000 in cash as a controlled bribe payment.

Romasanta asked Curescu to pay her for the zoning approval soon after Wellhausen submitted his report. Curescu stated that he would not pay until all of the work for the Granville property was finished, *i.e.*, until he had architectural plans that had been stamped and approved by the city zoning reviewer. On the morning of September 20, 2007, Romasanta told Curescu that she had the final, stamped, architectural plans and he agreed to meet her at a gas station to pay her. Romasanta asked Curescu whether he knew "how much he was supposed to bring," to which Curescu responded, "I do." Curescu arrived at the gas station first, however he left before the meeting with Romasanta could take place. When Romasanta arrived at the parking lot, surveillance officers who had been watching Curescu told her that he had just left. At trial, surveillance officers testified that they saw Curescu parked in a white van in the gas station parking lot and that they saw Lavinia Curescu come to the parking lot and speak with her husband before he left.

On the evening of September 20, Romasanta called Curescu and asked him "what happened" and "[w]hat was the problem with the money matters on that project for Granville." Curescu responded, "You'll have . . . somebody to stop by to see you. I just took off because I thought it was . . . it wasn't good for me. I saw something there that I didn't like at all." Romasanta then asked Curescu who was going to "stop by to see [her]." Curescu stated, "They got me, they got me, um, I don't like to talk on the phone. I think there is a problem, um, that is

in, in the air. You know and it's probably, you know better not to talk, but you'll be taken care of." Curescu confirmed that "this person will stop by and you will see somebody that you, you know."

That evening, a hardwood floor contractor named Jeremiah Deac, who had previously done work on Romasanta's house, called Romasanta. Deac told Romasanta that Curescu had asked him to "please go over [to Romasanta's house]" because "I promise something for Catherine." Deac and Romasanta agreed to meet at a highway oasis off the Edens Expressway after Romasanta expressed concerns that someone might follow Deac to her house. Deac was not able to arrive at the oasis on time, however, and he told Romasanta that Curescu would meet her at his office the next morning.

On the morning of September 21, 2007, Romasanta met with Lavinia Curescu at Curescu's office. The meeting was not recorded. Romasanta testified that Lavinia Curescu gave Romasanta an envelope containing $10,000 in cash, which was the bribe payment that Curescu had agreed to pay Wellhausen for approval of the two illegal basement apartments in the Granville property. The jury found Curescu guilty of the substantive bribery count associated with this cash payment.

### B.     Curescu's Motion for Judgment of Acquittal

Curescu, in his motion for judgment of acquittal, focuses on the fact that he was not an experienced real estate developer and that Romasanta never told him outright that she was going to pay a bribe to a city official. As Curescu emphasizes, at trial the government relied heavily on Romasanta's testimony to establish his knowledge of the bribery scheme. Thus, for example, Romasanta testified that whenever they discussed the "maximum fee" that Curescu would pay

per unit, she understood him to be telling her that "he did not want to pay more than $5,000 bribe per unit to the inspector." The thrust of Curescu's argument is that Romasanta's testimony was incredible as a matter of law. Without Romasanta's interpretation of the recorded conversations, Curescu concludes, the government's evidence was not sufficient to support his convictions.

"Only in the narrowest of circumstances will the defendant succeed . . . in establishing that testimony credited by a jury was incredible as a matter of law." *United States* v. *Alcantar*, 83 F.3d 185, 190 (7th Cir. 1996). The defendant must show that the testimony was "unbelievable on its face" because it would have been physically impossible for the witness to observe what she described or because it would have been impossible under the laws of nature for the events to have occurred. *Id.* Curescu argues that Romasanta's testimony was incredible as a matter of law because her testimony that he had agreed to pay the zoning inspector a $4,000 bribe per unit on the Maplewood project was false. The court will discuss the relevant facts in detail because they also bear upon Curescu's motion for a new trial.

During her testimony, Romasanta stated several times that Curescu had agreed to pay the zoning inspector a $4,000 bribe per illegal unit on the Maplewood project and that the Maplewood project involved obtaining approval from the city for two additional dwelling units in the basement. She also stated that Curescu gave her "$8,000 to pay as a bribe to zoning inspector Tony Valentino" for the Maplewood project. As the government concedes, the Maplewood project involved four additional dwelling units, not two. Thus if Romasanta paid a total of $8,000 to Inspector Valentino, she would have paid a bribe of only $2,000 per unit. In addition, during cross examination, Romasanta was impeached by her prior statements to government investigators regarding the amount of the Maplewood bribe. Specifically, when

Romasanta was interviewed by investigators in June of 2007, she stated that she had paid Inspector Valentino $3,000 per illegal dwelling unit. When she was interviewed again in July of 2009, she stated that she had paid a $6,000 bribe to Inspector Valentino, or $1,500 per unit. Inspector Hodapp also testified, during cross-examination, that Romasanta never told him that she paid a $16,000 bribe to Inspector Valentino on the Maplewood project. Thus defense counsel argued that when Curescu told Romasanta that he would pay her $4,000 per unit like "last time," he could only be referring to Romasanta's expediting fee for the Maplewood project and not to bribes to city officials.

Romasanta's testimony about the Maplewood project, though inaccurate, was not incredible as a matter of law. *See Alcantar*, 83 F.3d at 189 ("Testimony is not incredible as a matter of law . . . only because the witness may have been impeached by certain discrepancies in his story, by prior inconsistent statements, or by the existence of a motive to provide evidence favorable to the government."). Moreover, during his cross examination of Romasanta and Inspector Hodapp, Curescu's counsel thoroughly explored the same facts relating to the Maplewood project that he highlights in the instant motion. During closing statements, defense counsel argued forcefully and at length regarding the significance of the Maplewood testimony:

> Now, [Romasanta] got caught in several lies, but I want to focus on one, which I suggest to you destroys the credibility of their entire case. You'll recall that on the Maplewood project Miss Romasanta told you that she bribed the zoning inspector named Tony Valentino for the phony inspection, and she told you that she paid him $8,000. Well, it came out that originally she said it was six, but later she decided it was eight.
>
> And let's look at the exhibit of what Mr. Curescu said on the tapes June 28th at 10:40 a.m. . . . . And what he says to her . . . is I believe I gave you four grand per unit last time. . . . And Miss Romasanta testifies that every time Mr. Curescu talks about price per unit, he was talking about the bribe payment he had agreed to pay to Inspector Valentino. . . . She said it was an $8,000 bribe I paid to Inspector

Valentino, and he wanted to add additional units. Two times four is eight. That's the bribe payment he's talking about. Except now we know that on the Maplewood project Mr. Curescu added four units, not two units. 4 times 4 is 16. And there's no testimony that she ever gave Inspector Valentino $16,000.

Now why is this so important? Because when Dumitru is saying last time I gave you four grand per unit, he's not talking about a bribe payment. He's talking about her fee. . . . That was her price, four grand a unit. And if Miss Romasanta shared some of that fee with Inspector Valentino, there's no way that Mr. Curescu would know that. He doesn't know what method she used to get him his permits.

Counsel stated, "Every single time that Miss Romasanta told you from that witness stand that when . . . they're talking about price per unit, they're talking about the bribe payment, every single time she said that she was lying." Defense counsel also argued, as in the instant motions, that the government knew that Romasanta was lying, prompting an objection from the prosecution:

Defense counsel:      [T]hey [the government] interviewed Miss Romasanta more than 50 times to get her ready to testify. . . . Why wouldn't they have explained to her, look, it was a four unit thing. You're misremembering. The reason they didn't do it is because it was convenient. Because if it was only two units, then she can say, this is a discussion about bribe payments. Not her fee, bribe payments. And every time she said that, she was lying and they knew she was lying and they let her say it because it was convenient.

Prosecution:      Judge, I'm going to object to that. I'm going to object to that.

The court sustained the objection.

When Romasanta's testimony and the government's other evidence is viewed in the light most favorable to the government, it is clear that there was sufficient evidence to support the jury's guilty verdict. *See United States* v. *Rollins*, 544 F.3d 820, 835 (7th Cir. 2008) ("It is up to the jury to weigh the evidence and determine the credibility of the witnesses; we do not second-

guess the jury's assessment of the evidence."). As the record demonstrates, the inaccuracies in Romasanta's testimony – and her possible motivations for testifying inaccurately – were thoroughly exposed to the jury. Although Romasanta's credibility was discredited somewhat during cross-examination, it does not follow that the jury was obliged to acquit as a result. The details regarding the Maplewood bribe were relevant to Curescu's knowledge or lack of mistake. In the taped conversations that were played to the jury, Curescu does not state that the $4,000 payment for the Maplewood project refers to an expediting fee. He merely stated, "I believe I gave you $4,000 per unit last time." Based on the undisputed evidence that a bribe was paid to Inspector Valentino in connection with the Maplewood project, the jury could have concluded that Curescu knew that a portion of the $4,000 had been used to pay a corrupt inspector even if Romasanta was mistaken as to the amount of the bribe or the number of units involved. The inference that the $4,000 payment was Romasanta's expediting fee is perhaps one permissible inference but not a compelling one. Furthermore, the Maplewood testimony was a small subset of the evidence presented by the government under Rule 404(b). Even if the jury entirely disbelieved Romasanta's testimony about Maplewood, there was considerable evidence implicating Curescu at the heart of the government's case regarding the Granville property scheme. The court will not disturb the jury's verdict in these circumstances. *See Alcantar*, 83 F.3d at 189 ("When a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it, we have no basis to interfere, as the jury is the final arbiter on such questions.").

Curescu also argues that the fact that he refused to pay Romasanta's fee until he had received the stamped architectural plans proves that Curescu did not intend his payment to

Romasanta on September 21 to be passed on to Inspector Wellhausen as a bribe. Curescu asserts that, had he been part of the conspiracy to bribe Inspector Wellhausen, he would have paid the money to Romasanta when she requested it on August 30, so that it could be passed on immediately to Inspector Wellhausen. The significance of Curescu's withholding of payment was a question for the jury, however, and the court will not second-guess the verdict on these grounds. Curescu might have thought that Romasanta would only pay Inspector Wellhausen once the plans were finalized. He might have withheld the payment simply as a means of guaranteeing Romasanta's performance. A jury could reasonably conclude that Curescu was guilty despite the fact that he delayed paying Romasanta for the architectural plans.

In sum, the evidence presented at trial, taken in the light most favorable to the government, is sufficient to support Curescu's conviction. Indeed, the record contains ample evidence from which the jury could find guilt beyond a reasonable doubt. The motion for judgment of acquittal will be denied.

## II.     Motion for New Trial

Curescu argues that he is entitled to a new trial because (1) the court erred in excluding certain "good acts" evidence and admitting Romasanta's testimony regarding Curescu's knowledge of the bribery scheme, (2) the government committed misconduct during rebuttal closing arguments by attacking his character, and (3) the government committed misconduct by eliciting and relying on Romasanta's testimony regarding the Maplewood project.

### A.     Evidentiary Rulings

Curescu argues that the court erred in excluding evidence regarding the quality of the materials that he used on the Granville property, the work that he continued to do on the property

even after his arrest, and the appraisal report for the Granville property. The court adheres to its prior rulings on each of these issues.

Curescu also argues that much of Romasanta's testimony was admitted in violation of Federal Rule of Evidence 701. Although not tendered as a testifying expert, nor did she prepare a report, throughout her testimony, Romasanta was asked by the prosecutor to explain what she "understood" Curescu's recorded statements to mean. Romasanta was also asked to explain what she meant when she made various ambiguous or "coded" statements to Curescu. Under Rule 701, Romasanta's testimony could only be admitted if it was (1) rationally based on her perceptions, and (2) helpful to the jury. *See* Fed. R. Evid. 701(a), (b). Both of these requirements are met here. Romasanta's testimony was based on her experience as a corrupt expediter and her first-hand knowledge of Curescu that was obtained during the course of their conversations and meetings for the Maplewood and Granville projects. *See United States* v. *Estrada*, 39 F.3d 772, 773 (7th Cir. 1994) (witness's testimony was rationally based on his own perceptions because he participated in the conversations at issue and testified as to his understanding of the conversations). Romasanta's testimony was also helpful to the jury because it assisted them in understanding the content of the recorded conversations. *See id.* (citing *United States* v. *Simas*, 937 F.2d 459, 465 (9th Cir. 1991) (testimony allowed as to meaning of vague and ambiguous statements)). Romasanta was not asked to give her opinion as to the lawfulness of Curescu's conduct. *Cf. United States* v. *Wantuch*, 525 F.3d 505, 514 (7th Cir. 2008) ("The question posed to [the witness] to opine as to [defendant's] knowledge of whether his actions were 'legal,' demanded a conclusion as to the legality of [defendant's] conduct, which is unhelpful to the jury under Rule 701."). The fact that Romasanta referred to "bribes" in

her opinion testimony does amount to an impermissible legal conclusion; the word "bribe" is commonly used outside the legal context and is the best description of the activity referred to in her testimony.  *See* 4 *Weinstein's Federal Evidence* § 701.04 ("Lay opinions may use words that have both legal and common meanings when the testimony is helpful and would not confuse the jury.").  The testimony was therefore properly admitted under Rule 701.

### B.      Prosecutor's Comments During Rebuttal Closing Arguments

During rebuttal closing arguments, the prosecutor argued that Curescu's "character" could be inferred from his association with Romasanta.  Defense counsel objected to the reference to Curescu's character, and the court sustained the objection.

| | |
|---|---|
| Prosecutor: | [W]hat's also important to remember is while the government called Catherine Romasanta as a witness, the defendant chose her. . . . [W]hen it came time for Granville, who did he call?  He called Catherine Romasanta.  She was his expediter.  She was the person when push came to shove and trouble came up, she was the person he called. |
| | And there's this old saying that kind of comes into mind when we're talking to [Curescu] about words that he used with other people.  I'm rubber and you're glue. |
| | Whatever you say to me, bounces off me and sticks to you.  Well, think about that for just a second.  All of the disparaging things that Mr. Goodman talked about Catherine Romasanta, they all to a certain extent in the terms of the bribes that were paid, they paint a very negative picture of the defendant because it was the defendant who chose Catherine Romasanta.  All the bad – he was the one who chose her.  So, in fact, like I said, when you consider all of those very negative things that Mr. Goodman said about Catherine Romasanta, what does that tell you about the defendant's character, about his decisions? |
| Defense: | Objection, Your Honor.  His character is not at issue. |
| Court: | Correct.  Sustained. |

Curescu argues that the prosecutor's comments were improper and that the jury might have inferred his guilt based on his association with Romasanta.

The court uses a two-part test to evaluate alleged prosecutorial misconduct during closing arguments. First, the court considers whether the prosecutor's remarks were improper. *United States* v. *Berg*, 640 F.3d 239, 253 (7th Cir. 2011). If they were improper, the court then must "consider the remarks 'in the context of the entire record and assess whether they had the effect of denying the defendant a fair trial.'" *Id.* (quoting *United States* v. *McMath*, 559 F.3d 657, 667 (7th Cir.), *cert. denied*, — U.S. —, 130 S. Ct. 373, 175 L. Ed. 2d 137 (2009)). As part of its assessment of whether a defendant was denied a fair trial, the court examines the seriousness of the statement, whether the jury was adequately instructed to disregard such statements, whether defense counsel was able to counter the improper statement through rebuttal, and whether the weight of the evidence was against the defendant. *Id.*

Even if it is assumed that the prosecutor's comment was improper, the record does not demonstrate that Curescu was deprived of the right to a fair trial. Defense counsel objected to the comment and stated that Curescu's character was "not at issue." The court agreed that this was "correct" and sustained the objection. Moreover, the prosecutor's reference to defendant's character took place in the context of an otherwise proper line of argument. The purpose of the prosecutor's argument was to refute Curescu's assertion that Romasanta was a cooperating witness, with scant ties to Curescu, who was merely trying to obtain a conviction through improper means in order to please the government. Given the context of the prosecutor's remark, and the other evidence from which the jury could properly infer Curescu's guilt, the reference to Curescu's "character" did not deprive him of a fair trial.

### C.    Romasanta's Testimony

Curescu argues that the government knowingly elicited false testimony from Romasanta regarding the Maplewood project and thereby violated his right to due process.  In order to justify the granting of a new trial based on the government's use of false testimony, the defendant must establish that (1) the prosecution's case included false testimony; (2) the prosecution knew, or should have known, of the false testimony; and (3) there is a reasonable likelihood that the false testimony affected the judgment of the jury.  *Griffin* v. *Pierce*, 622 F.3d 831, 841 (7th Cir. 2010).  "[M]ere inconsistencies in testimony do not establish the government's knowing use of false testimony."  *United States* v. *Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (quoting *United States* v. *Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990)).  The defendant need not demonstrate that the witness could have been successfully prosecuted for perjury, however.  *United States* v. *Freeman*, — F.3d —, 2011 WL 2417091, at *5 (7th Cir. June 17, 2011).  "It is enough that the jury was likely to understand the witness to have said something that was, as the prosecution knew, false."  *Id.* (quoting *United States* v. *Boyd*, 55 F.3d 239, 243 (7th Cir. 1995)).  In analyzing whether the presentation of allegedly false testimony deprived the defendant of a fair trial, the court must also consider whether the defendant had the opportunity to expose the false statements through cross-examination.  *Saadeh*, 61 F.3d at 523.

Taking the foregoing factors into account, the court is persuaded that the government's use of Romasanta's testimony did not deprive Curescu of a fair trial.  Curescu focuses on two alleged inaccuracies in Romasanta's testimony: (1) her testimony that two illegal dwelling units were added to the Maplewood property, and (2) her testimony that she paid a bribe of $4,000 per

illegal dwelling unit to Inspector Valentino.[3]  Even if Romasanta's testimony regarding these

details of the Maplewood bribe was false, rather than mistaken, and the government knew this

testimony was false, there is not a reasonable likelihood that the testimony affected the judgment

of the jury.[4]  As discussed in the court's ruling on Curescu's motion for judgment of acquittal,

defense counsel revealed the inconsistencies in Romasanta's testimony during cross examination

and explained the possible significance of the inconsistencies during closing arguments.  There

can be no doubt that the jury was aware of Romasanta's many stumbles over the details of the

Maplewood project.  Moreover the prosecutor did not, as Curescu asserts, improperly argue that

Romasanta's testimony should be credited during closing arguments.  *Cf. Freeman*, 2011 WL

2417091, at *6.  The transcript reflects that the prosecutor emphasized that after Curescu said, "I

believe I gave you four last time," Romasanta responded, "Okay, we'll work on something with

these guys.  We'll see if it works out."  As the prosecutor argued, "You know[] this is not Ms.

Romasanta's expediting fee because of this statement.  She knows what her expediting fee is.

There is no guy to work out her fee with.  The guys only come into the picture if she is talking

about a payment of an illegal bribe."

In addition, it is uncontested that Romasanta paid a bribe to Inspector Valentino in

connection with the Maplewood project.  The jury could have concluded that Romasanta was

---

[3]  The relevant facts are set forth in detail above and will not be recounted again here.

[4]  It appears that the government knew that Romasanta was mistaken as to the number of illegal
dwelling units in the Maplewood project.  This was the second time that Curescu had been tried for the
offenses alleged in the indictment.  At Curescu's first trial, Romasanta testified that the Maplewood
project involved the addition of two units, not four, and that she paid an $8,000 bribe to Inspector
Valentino.  Curescu's defense counsel argued that he should be able to impeach Romasanta's testimony
by showing that the Maplewood project involved four units.

mistaken as to the amount of the Maplewood bribe but that Curescu nevertheless knew that a bribe had been paid.[5] Although defense counsel was entitled to argue that Curescu was referring to Romasanta's expediting fee when he said the he gave her $4,000 per unit "last time," the jury was not required to accept this conclusion.[6] Based on the other evidence presented at trial, the jury could reasonably have concluded that Curescu was referring to his total payment to Romasanta and that he knew that some or all of the payment had been used as a bribe.

Finally, Curescu's argument that the details of the Maplewood bribe scheme were "critical" to the government's case is unconvincing. There was other evidence from which the jury could have inferred Curescu's state of mind–in particular, his lengthy negotiations with Romasanta regarding the amounts to be paid, his statements after the aborted gas station meeting on September 20, and the undisputed sequence of events. As the prosecutor emphasized during closing statements, and as the court instructed the jury on two occasions, the Maplewood evidence was only to be used for the limited purpose allowed by Federal Rule of Evidence 404(b), here, lack of mistake. Although Romasanta relied on her recollection of the Maplewood bribes to explain the significance of her recorded conversations with Curescu, the jury could

---

[5] Presumably, the government had no way of verifying the amount of money paid by Romasanta to Valentino as a bribe. The government's information about the amount of the bribe came from Romasanta.

[6] The total amount that Curescu paid to Romasanta is unclear. In his post-trial motions, Curescu asserts that he paid Romasanta a total of $16,000. In support, he cites his testimony from his first trial. Curescu testified that he paid Romasanta a total of $16,000 for the Maplewood project, which would equal $4,000 per illegal dwelling unit added. He further testified that he cashed a check for $14,500 and then gave Romasanta another $1,500 in cash from his office. At Curescu's second trial, the parties stipulated that a check was drawn for $14,500 on the account of Peppa Remodeling, Curescu's remodeling company. Curescu has not cited any portion of the transcript where evidence of an additional $1,500 payment in cash was admitted. In its response to Curescu's motion, the government does not contest that Curescu paid Romasanta $16,000 in connection with the Maplewood project. Romasanta, however, consistently testified that she received $12,000 from Curescu.

have disregarded her testimony and relied on other evidence to find the requisite state of mind.

*See United States* v. *Adcox*, 19 F.3d 290, 295 (7th Cir. 1994) ("[T]he alleged perjured testimony must bear a direct relationship to the defendant's guilt or innocence.").  Indeed, the fact that Curescu was acquitted of two counts, and was unable to reach unanimity as to the third, indicates that the jury assessed Romasanta's testimony critically.  Therefore Curescu has not shown that he was deprived of a fair trial and his motion for a new trial will be denied.

**CONCLUSION AND ORDER**

For the foregoing reasons, Curescu's motions for judgment of acquittal and a new trial [#394, 395] are denied.


Dated: June 29, 2011            Enter:  _____
                                         JOAN HUMPHREY LEFKOW
                                         United States District Judge